426 S.E.2d 510

**Ed PELL, Jim E. Craft, Glenn Dowdy, Charles Allen and Bobby E. Via, Petitioners Below, Appellees**

v.

**The BOARD OF EDUCATION OF MONROE COUNTY; and Kyle Baker, Robert Weikle, Harry H. Mohler, Sharon Harris and Steve Miller, each individually, Members of the Board of Education of Monroe County, Respondents Below, Appellants**

**School Building Authority of West Virginia, Intervenor–Appellee.**

**No. 21414.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 4, 1992.

Decided Nov. 25, 1992.

Dissenting Opinion of Justice Neely Dec. 7, 1992.

---

Barry L. Bruce, Lewisburg, for appellants.

Jesse O. Guills, Jr., Lewisburg, for appellees.

Mario J. Palumbo and Brentz H. Thompson, Office of the Atty. Gen., Charleston, for School Bldg. Authority, intervenor-appellee.

McHUGH, Chief Justice:

This case is before the Court upon the appeal of the Board of Education of Monroe County, and Kyle Baker, Robert Wei-

kle, Harry H. Mohler, Sharon Harris, and Steve Miller, members of that Board of Education, the respondents below. The appellees and petitioners below are Ed Pell, Jim E. Craft, Glenn Dowdy, Charles Allen, and Bobby E. Via.[1] The appellants are aggrieved by the final order of the Circuit Court of Monroe County entered on September 23, 1992. The lower court proceeding was a mandamus action which sought to compel the respondents to implement a school consolidation plan.

# I

In the spring of 1990, a Comprehensive Educational Facilities Plan (CEFP) was completed by the Board of Education of Monroe County and filed with the state board of education. Under this plan: new construction would begin on a new high school at Coulters Chapel for grades 9 through 12; Peterstown and Union High Schools would be closed; the elementary and junior high schools at Greenville would be closed; ninth grade students would be transferred to the new high school; and middle and elementary students would be placed at Gap Mills, Union, or Peterstown.

The state board of education approved the CEFP and it was then submitted to the regional educational service agency (RESA) for priority consideration on a competitive basis for grant funds through the school building authority (SBA).[2]

---

1. The School Building Authority of West Virginia is an intervenor-appellee in this proceeding.

2. The approval of a CEFP involves an exhaustive process. What follows is merely a *brief* summary of that process:

Following completion by the county board of education, the CEFP is submitted to the state board of education for approval. *W.Va.Code,* 18–5–13a [1991] provides, in part: "Any such proposal to close or consolidate any school by any county board of education shall be further subject to any current rules and regulations of the state board of education relating to school closing or consolidation[.]"

After approval by the state board of education is obtained, the CEFP is submitted to a regional educational service agency (RESA). *W.Va.Code,* 18–2–26(a) [1990] requires that the state board of education establish multicounty regional service agencies "[i]n order to consolidate and administer more effectively existing educational programs and services so individual districts will have more discretionary moneys for educational improvement and in order to equalize and extend educational opportunities[.]"

*W.Va.Code,* 18–9D–16 [1990], in turn, sets forth extensive guidelines for prioritization by the RESA. In its entirety, that section provides:

(a) To facilitate the goals as stated in section fifteen [§ 18–9D–15] of this article and to assure the prudent and resourceful expenditure of state funds, each regional educational service agency created pursuant to section twenty-six [§ 18–2–26], article two of this chapter shall submit a region-wide facilities plan that addresses the facilities needs of each district within the region pursuant to such guidelines as shall be adopted by the authority in accordance with this section. Any project receiving funding shall be in furtherance of such approved facilities plan.

(b) To assure efficiency and productivity in the project approval process, the facilities plan shall be submitted only after a prelimi-

nary plan, a plan outline or a proposal for a plan has been submitted to the authority. Selected members of the authority, which selection shall include citizen members, shall then meet promptly with those persons designated by the regional educational service agency, including one person from each county within the region, to attend the facilities plan consultation. The purpose of the consultation is to assure understanding of the general goals of the school building authority and the specific goals encompassed in the following criteria and to discuss ways the plan may be structured to meet those goals.

(c) The guidelines for the development of a facilities plan shall state the manner, timeline and process for submission of any plan to the authority; such project specifications as may be deemed appropriate by the authority; and those matters which are deemed by the authority to be important reflections of how the project will further the overall goals of the authority.

The guidelines regarding submission of the plans shall include requirements for public hearings, comments or other means of providing broad-based input within a reasonable time period as the authority may deem appropriate. The submission of each facilities plan shall be accompanied by a synopsis of all comments received and a formal comment by each county board included in the region. The guidelines regarding project specifications may include such matters as energy efficiency, preferred siting, construction materials, maintenance plans or any other matter related to how the capital improvement project is to proceed. The guidelines pertaining to quality education shall require that a facilities plan address how the current facilities do not meet and the proposed plan and any project thereunder does meet the following goals:

(1) Student health and safety;

(2) Economies of scale, including compatibility with similar schools that have achieved

Initially, the Monroe County CEFP placed second in priority consideration to a plan in McDowell County, but upon the return of funds from McDowell County, another priority consideration was performed. Although the Monroe County

CEFP placed second again, it was awarded a needs grant of $7,810,091.86. This grant, combined with local funding, was projected to meet the total cost of the plan, which is approximately $8.4 million. The Monroe County Board of Education was notified of

the most economical organization, facility utilization and pupil-teacher ratio;

(3) Reasonable travel time and practical means of addressing other demographic considerations;

(4) Multi-county and regional planning to achieve the most effective and efficient instructional delivery system;

(5) Curriculum improvement and diversification, including computerization and technology and advanced senior courses in science, mathematics, language arts and social studies;

(6) Innovations in education such as year-round schools and community-based programs; and

(7) Adequate space for projected student enrollments.

If the project is to benefit more than one county in the region, the facilities plan shall state the manner in which the cost and funding of the project shall be apportioned among the counties.

(d) Each plan shall prioritize all the projects both within a county and among the counties, which priority list shall be the basis for determining how available funds shall be expended. In prioritizing the projects, each regional educational service agency shall make determinations in accordance with objective criteria to be formulated by the school building authority prior to the first day of January, one thousand nine hundred ninety-one.

(e) Each plan shall include the objective means to be utilized in evaluating implementation of the overall plan and each project included therein. Such evaluation shall measure each project's furtherance of each goal stated in this section and any guidelines adopted hereunder, as well as the overall success of any project as it relates to the facilities plan of its region and the overall goals of the authority.

(f) The authority may adopt guidelines for requiring that a regional educational service agency modify, update, supplement or otherwise submit changes or additions to an approved plan and shall provide reasonable notification and sufficient time for such change or addition.

The next step involves the school building authority (SBA). *W.Va.Code*, 18-9D-15(a) [1989] provides:

(a) It is the intent of the Legislature to empower the school building authority to facilitate and provide state funds for the construction and maintenance of school facilities so as to meet the educational needs of the

people of this state in an efficient and economical manner. The authority shall make funding determinations in accordance with the provisions of this article and shall assess existing school facilities and each facilities plan in relation to the needs of the individual student, the general school population, the communities served by the facilities, and facility needs statewide.

Finally, in any event, prior to a closure or consolidation, provisions for notice and hearing exist to be conducted by the county board of education. *W.Va.Code*, 18-5-13a [1991], part of which is quoted above, provides, in pertinent part:

In addition to the provisions of section thirteen [§ 18-5-13] of this article, prior to any final decision of a county board of education on any proposal to close or consolidate any school, except in cases in which a construction bond issue was passed by the voters and which bond issue included the schools to be closed or consolidated, the county board of education shall:

(1) Prepare and reduce to writing its reasons and supporting data regarding such school closing or consolidation. The written reasons required under this section shall be available for public inspection in the office of the county school superintendent during the four successive weeks before the date of the public hearing required by this section; and

(2) Provide for a public hearing, notice of which shall be advertised by publication in a newspaper of general circulation in the locality of the affected school at least once a week for four successive weeks prior to the date of the hearing. The notice shall contain the time and place of the hearing and the proposed action of the school board. A copy of such notice shall be posted at the affected school in conspicuous working places for all professional and service personnel to observe, and such notice shall remain posted for four successive weeks prior to the date of the required public hearing. At least a quorum of the school board members and the county superintendent from the county wherein the affected school is located shall attend and be present at the public hearing. Members of the public shall have the right to be present, to submit statements and testimony, and to question county school officials at the public hearing.

As can be seen from this summary, approving a plan of closure or consolidation is not something that can be accomplished overnight, but is a protracted ordeal so as to ensure a more contemplative analysis before such a major decision is made.

the award in January 1991. Accordingly, in May 1991, a grant contract was signed between the SBA and the Monroe County Board of Education, effective March 25, 1991.

Following public hearings, the Monroe County Board of Education, on April 15, 1991, voted 3 to 2 to close the two high schools, as well as the junior high and elementary schools. In June 1991, the state board approved the consolidation plan.

On May 12, 1992, an election for members of the Monroe County Board of Education was held. Harry Mohler and Steve Miller were elected. Mohler had openly questioned the validity of the consolidation plan.

On May 18, 1992, two board members who opposed the consolidation plan and board member-elect Mohler sent a letter to the three board members who were in favor of the plan, expressing an interest in evaluating a new plan, and to not make any contractual commitments on the proposed plan.[3]

On June 13, 1992, the prior county board approved contracts with the architect, Gandee & Partners, and the construction manager, Kenhill Construction Co., Inc. On June 24, 1992, the prior county board voted, 3–2, to submit the design development plans to the SBA for approval.

On July 1, 1992, the terms of the new board members began, and on July 6, 1992, they took office, delaying any action on the new school for thirty days.

On August 4, 1992, a committee was appointed by the current county board to review the feasibility of developing an alternative plan as well as the deficiencies of the current CEFP. On August 27, 1992, a "cease and desist" order was placed on any action on the current CEFP by the current county board. Among other things, the appellants contend that the CEFP is deficient because the Gap Mills facility should be closed, and new transportation times

exceed state guidelines for certain students affected by the plan.

On September 14, 1992, the current county board voted, 3–2, to not approve budget supplements that would have placed the proposed plan in the school-year budget. Upon a petition for a writ of mandamus by the appellees, the Circuit Court of Monroe County held that the appellants, the current county board, has a legal duty to proceed with the current plan of consolidation, and that the actions of the appellants, in failing to proceed with implementing the CEFP, were arbitrary and capricious.

On September 27, 1992, the current county board voted to submit a draft of an alternative plan of consolidation to the SBA. On September 28, 1992, the SBA refused to consider such a draft. The alternative plan includes closing the elementary school at Gap Mills, which, as asserted by the appellants, would save in transportation costs.

The parties have stipulated total expenses incurred, to date, for the new consolidated high school are $181,000, of which $65,104.09 has been paid.

## II

We begin our discussion of the relevant legal principles implicated in this mandamus appeal by pointing out that the issue in this case is not the merits of consolidation. Our concern is not whether consolidation is a good idea for the schools in Monroe County. Rather, the primary legal issue raised by the appellants in this case is whether the circuit court committed error by ruling that their actions were arbitrary and capricious. For reasons stated herein, we hold that the circuit court did not commit error, and accordingly, affirm the judgment of that court.

*W. Va. Code*, 18–5–13 [1990] provides, in part: "The [county] boards [of education], subject to the provisions of this chapter and the rules and regulations of the state board [of education], shall have the authority: ... (3) To close any school which is

---

**3.** For ease of reference, the Monroe County Board of Education, as constituted prior to the May 1992 election, will hereinafter be referred to as the "prior" board, while the board, as constituted after the election, will be referred to as the "current" board, or the appellants.

unnecessary and to assign the pupils thereof to other schools ... [and] (4) To consolidate schools[.]"

In *Haynes v. Board of Education*, 181 W.Va. 435, 436, 383 S.E.2d 67, 68 (1989), we declined to address the "wisdom or correctness" of a county board of education's decision to close and consolidate schools. In *Haynes*, at issue was whether proper hearings and votes were conducted by a county board of education prior to consolidation procedures.

However, we believe that the "wisdom or correctness" of the appellants' actions in this case is inapposite to the circuit court's decision, because wisdom or correctness of the decision to close or consolidate schools is not at issue. Rather, what is at issue is whether the appellants' actions were arbitrary and capricious by intentionally not implementing a consolidation plan *that had already been approved and for which extensive steps had been taken.*

■ Although *W.Va.Code*, 18–5–13 [1990] vests in a county board of education the authority to close and consolidate schools, the discretion to exercise this authority is not unfettered. This Court has recognized the following principle: "Mandamus will lie to control a board of education in the exercise of its discretion upon a showing of caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of the law." Syl. pt. 4, *Dillon v. Board of Education*, 177 W.Va. 145, 351 S.E.2d 58 (1986). *See State ex rel. Hawkins v. Tyler County Board of Education*, 166 W.Va. 363, 366, 275 S.E.2d 908, 912 (1980); syl. pt. 5, *State ex rel. Withers v. Board of Education*, 153 W.Va. 867, 172 S.E.2d 796 (1970); syl. pt. 1, *State ex rel. Payne v. Board of Education*, 135 W.Va. 349, 63 S.E.2d 579 (1951).[4]

■ The appellants, in support of their contention that mandamus is inappropriate in this case, cite decisions from other jurisdictions. For example, in *State ex rel. Johnson v. Butler County Board of Education*, 107 Ohio App. 98, 152 N.E.2d 358, 360 (1957), the Court of Appeals of Ohio, in a mandamus proceeding to compel a board of education to declare the creation of a school district completed, held:

We are of the opinion that for this Court to issue a writ of mandamus in this case would in effect be substituting its decision and its discretion for that of the Board, which is charged by the law with the duty, and would be a judicial usurpation. The fact that the Board has taken one or more steps toward consolidation does not commit it to a non-discretionary duty to complete the consolidation. It can retrace its steps or it can postpone, as its sound discretion dictates.

*See also State ex rel. Irish v. Board of Education*, 6 Ill.App.2d 402, 128 N.E.2d 348, 350–51 (1955).

However, the holding of the Ohio *Johnson* case is clearly distinguishable from the case now before us. In *Johnson*, the court recognized the principle that a county board of education may step back from a consolidation plan which it had already undertaken. Noticeably absent from the fact pattern in that case is the involvement of certain dynamics that are involved in this case, such as a state school building authority which has granted priority of funding to the Monroe County CEFP. *See W.Va.Code*, 18–9D–1, *et seq.* (establishing school building authority); *supra* note 2. Moreover, this funding has been granted to the exclusion of competing CEFP's, that is, other consolidation plans that, but for the granting of funds to the Monroe County plan, would possibly have been funded as a higher priority.

---

**4.** In another context, specifically, where the *state* board of education has been the party standing in the way of a closure and consolidation plan, this Court has recognized the limited power of a county board of education with respect thereto.

County boards of education do not have unlimited power to make the final decisions with respect to school closings and consolidations. The plain language of W.Va.Code, 18–5–13 (1990) and W.Va.Code, 18–5–13a reflects that such decisions may be rejected where they fail to comply with statutory provisions or West Virginia Board of Education regulations.

Syl. pt. 1, *Board of Education v. West Virginia Board of Education*, 184 W.Va. 1, 399 S.E.2d 31 (1990).

Furthermore, it is pointed out by the appellees that to allow the appellants to not implement the CEFP would place in jeopardy the funds granted by the SBA, which amount to approximately $8 million.

The SBA asserts before this Court that even if a new plan would be developed, the Monroe County Board of Education must adopt an amendment to the CEFP, submit the alternative plan to the State Board of Education for its approval, seek priority within RESA, and compete with other approved projects for actual funding by the SBA. *See supra* note 2. It is further asserted by the SBA that this entire process, which takes several months to complete, would not even be among the listed projects to be funded by the SBA because such a listing is due this month, November.

Clearly, we believe that because the steps already taken by all parties involved in implementing the CEFP have been so extensive, to cease implementation at this late stage and further jeopardize the possibility of funding for an alternative plan would constitute action that is arbitrary and capricious.[5] To allow the currently constituted board of education to cease implementation of the already-approved CEFP would defeat the purpose of the establishment of the SBA. *See W.Va. Code*, 18–9D–15(a) [1989]; *supra* note 2.

Furthermore, the reasons for not implementing the CEFP are not even clearly articulated, if such reasoning even exists.[6]

This, too, is action that is arbitrary and capricious.

■ Accordingly, we hold that pursuant to *W.Va.Code*, 18–5–13 [1990], a county board of education has the authority to close and consolidate schools. However, mandamus will lie to control a county board of education in the exercise of its discretion upon a showing of caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of the law. If a comprehensive educational facilities plan has been developed by a county board of education, approved by the state board of education, submitted to a regional educational services agency, granted approval for funding on a priority basis by the state school building authority, satisfied all requirements for approval, notice, and hearing pursuant to *W.Va.Code*, 18–5–13a [1991], and contracts have been entered into to begin implementation of such plan, then it is arbitrary and capricious for a county board of education, with no articulated reasons, to take action that would cause the plan to not be implemented or to replace such plan with an alternative plan, where such action would place in jeopardy the possibility of obtaining the approved funding.

Therefore, the order of the Circuit Court of Monroe County is affirmed.[7]

Affirmed.

NEELY, J., dissents and files a dissenting opinion.

---

**5.** The appellants point out that the contracts with both the architect and the construction manager contain provisions which allow either party to terminate the project upon appropriate notice if the project is permanently abandoned. This, however, is irrelevant. At issue in this proceeding is not the interpretation of the contracts involved. Rather, the issue concerns the actions of the appellants.

**6.** The minutes of the current board's July 6, 1992 meeting, with respect to the CEFP, merely reflect that

the board intends to put on hold for thirty days any action that relates to the proposed high school because when the board approved the contracts on June 13, 1992, the board may have been in error and that the board in its present counsel will study all previous action of the board as it relates to those contracts,

and also that the entire board examine the minutes of all meetings since May 1, 1992, and meet prior to August 7, 1992, to act upon such contracts for the architect and construction manager.

Nothing in these minutes indicates *why* the prior board "may have been in error."

**7.** In light of our holding, we need not address the appellants' contention that they were denied due process of law by the SBA's failure to follow guidelines pertaining to the alternative plan of consolidation. Such guidelines are required by *W.Va.Code*, 18–9D–16(d) [1990]. Because the appellants' action causing the CEFP to not be implemented is arbitrary and capricious, then the SBA need not have even considered the alternative plan.

Likewise, we need not address the appellants' contention that the SBA has a duty to pay the

NEELY, Justice, dissenting:

Filed Dec. 7, 1992.

I disagree with the majority's assertion that the issue in this case is not consolidation. The school board was changed by the voters of Monroe County at a regularly scheduled election to torpedo consolidation, which is what elected politics is all about. Thus, the issue before us *is* consolidation.

School consolidation has not been an unmixed blessing. Consolidation may be efficient, but then Auschwitz was efficient. Good instruction in chemistry, physics and mathematics is important, but it is also important that children go to school close to home, play football and be cheerleaders. At oral argument, it was undisputed that the current school system teaches advanced academic courses in English and Science and can prepare students for West Point or the University of California at Berkeley. Obviously, the current system is not broken and consolidation can wait for a proper plan that meets the needs of a larger constituency.

In a democracy, no political coalition is expected to be permanent—indeed, that almost is a *precondition* of democracy. In this case I find nothing arbitrary or capricious on the part of the board—they simply implemented the voters' will in a system where government should come from the people instead of coming at the people.

invoices for expenses already incurred. This argument was raised in the event that the validity of the CEFP's abandonment would have been upheld. Inasmuch as the abandonment of the CEFP is not held valid, however, this contention is no longer relevant to this case.