Don W. SMITH, Petitioner,

v.

NATIONAL TRANSPORTATION SAFETY BOARD, and James B. Busey, Administrator, Federal Aviation Administration, Respondents.

No. 91–1013.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1992.

Decided Jan. 15, 1993.

Jess J. Smith, Jr., Upper Marlboro, MD, for petitioner.

Harry S. Gold, Attorney, Federal Aviation Admin., with whom Peter J. Lynch, Attorney, FAA, Washington, DC, was on the brief, for respondent. Edmund J. Averman, III, Annandale, VA, entered an appearance for respondent.

Before WALD, D.H. GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Don Smith petitions for review of a National Transportation Safety Board order affirming the decision of the Federal Aviation Authority to suspend his commercial pilot's license for 60 days. We reverse the order of the NTSB because the FAA sanctions policy upon which it is based was not available to the public at the time of the conduct for which Mr. Smith was sanctioned.

## I. BACKGROUND

The FAA ordered that petitioner's license be suspended for 60 days because he had operated his aircraft without authorization in the Dallas–Fort Worth Terminal Control Area (TCA). In setting the 60–day penalty for this violation, the FAA relied upon Bulletin 86–2, an appendix to that agency's Compliance and Enforcement Manual. The Bulletin notes that the agency's prior (apparently ad hoc) sanctions policy had "not provided an effective deterrent" for TCA violations and specifies that in future cases "[s]uspension of airman certificates should not be less than 60 days...." The NTSB concedes that "printed copies of the Bulletin ... were probably not shipped until several weeks after the date on which Mr. Smith committed the violations...."

An Administrative Law Judge affirmed the FAA's finding that Smith had committed a TCA violation, but because of Smith's exemplary prior record, his "candor and demeanor," and his lack of "notice and knowledge" of the new TCA policy, the ALJ reduced from 60 to 45 days the period for which Smith's certificate was suspended. On review, however, the NTSB, invoking its policy of deferring to the FAA's choice of sanctions, reinstated the 60–day suspension. See NTSB Order and Opinion, No. EA–3212, at 7 (November 13, 1990). Smith petitions this court for review of the NTSB order.

## II. ANALYSIS

The petitioner argues that the FAA could not properly rely upon Bulletin 86–2 in suspending his license because the Bulletin was not publicly available at the time of his TCA violation. He relies primarily upon the section of the Administrative Procedure Act that requires each agency to make available to the public, and to include in an index of such matters, "administrative staff manuals and instructions to staff that affect a member of the public ...," and provides that in an enforcement action, an agency may not rely upon any manual or instruction that it has not made available to

the public. 5 U.S.C. §§ 552(a)(2)(C) and (a)(2).

In response, the NTSB contends first that the APA does not require the disclosure of a sanctions policy statement, such as Bulletin 86–2. Second, the Board argues that it did not in fact rely upon the Bulletin in approving the FAA's 60–day suspension of the petitioner's license. Neither contention is persuasive.

### A. The Availability Requirement of the APA

 The NTSB contends that a sanctions guideline such as Bulletin 86–2 should not be deemed to "affect a member of the public" within the meaning of the APA because "the severity of a sanction … is not a proper basis for deciding whether to commit unlawful conduct." The NTSB relies upon a dictum to this effect in *Capuano v. National Transportation Safety Board*, 843 F.2d 56, 58 (1st Cir.1988).

We need not decide today the normative question whether one "should" consider the severity of the sanction when deciding whether to engage in conduct prohibited by regulation. The statute plainly requires each agency to make available and to index staff manuals et cetera that "affect" the public, and the legislative history makes clear that the Congress thereby meant for the agency to disclose "all the documents having precedential significance." *See* H.R.Rep. No. 1497, 89th Cong., 2d Sess., at 8 (1966). That certainly includes a manual setting out the sanctions policy by which the agency will henceforth be governed in deciding particular cases.

The purpose of the APA availability requirement is obviously to give the public notice of what the law is so that each individual can act accordingly. Usually that means conforming to the law, but sometimes it means violating the law (or coming close and risking a violation) and accepting the known consequences of doing so—especially where a regulatory rather than a moral or criminal norm is concerned.

While some agency manuals and instructions to staff may have effects too indirect or attenuated materially to affect an individual's conduct, the severity of a sanction certainly does "affect" the public in the sense that it alters the public's behavior, at least at the margin. *See* Oliver Wendell Holmes, *The Path of the Law*, 10 HARV. L. REV. 457, 459 (1897) ("A man who cares nothing for an ethical rule which is believed and practiced by his neighbors is likely nevertheless to care a good deal to avoid being made to pay money, and will want to keep out of jail if he can"). Indeed, our legal system is in large parts premised upon the notion that as the cost associated with a particular type of behavior increases, the quantity of such behavior will decrease. *See* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 5 (4th ed. 1992) ("an increase in either the severity of the punishment or the likelihood of its imposition will raise the price of crime and therefore reduce its incidence"). *See also* A. Mitchell Polinsky & Steven Shavell, *The Optimal Tradeoff between the Probability and Magnitude of Fines*, 69 AM. ECON. REV. 880 (1979); Gary S. Becker, *Crime and Punishment: An Economic Approach*, 76 J. POL. ECON. 169 (1968).

Bulletin 86–2 itself reflects this basic behavioral assumption: it reports that the FAA increased the sanction for a TCA violation because the agency's prior policy had not "provided an effective deterrent." That is to say, the prior policy had not affected the public to the extent that the agency intended the new policy to affect the public.

In further support of its position, the NTSB suggests that the modifier "administrative" before the term "staff manual" in § 552(a)(2)(C) limits the disclosure requirement of that provision to "administrative matters rather than to law enforcement matters…." *See* S.Rep. No. 813, 89th Cong., 1st Sess., at 2 (1965). Thus, it says, an agency need not disclose guidelines used "in the selection or handling of cases, such as operational tactics, allowable tolerances, or criteria for defense, prosecution, or settlement of cases." *See* H.R.Rep. No. 1497, *supra*, at 7–8.

The disclosure of those sorts of guidelines could, of course, compromise enforce-

ment of the law or facilitate the circumvention of an agency's regulations. The disclosure of a minimum-sanction rule, such as that adopted in Bulletin 86–2, poses no such threat, however. *See Stokes v. Brennan,* 476 F.2d 699, 702 (5th Cir.1973) (agency secrecy justified "only to the extent that it protects policies governing enforcement methods which, if disclosed, would tend to ... reveal[ ] classes or types of violations which must be left undetected or unremedied because of limited resources"). *See also Cox v. Dept. of Justice,* 576 F.2d 1302, 1306–08 (8th Cir.1978); *Hawkes v. I.R.S.,* 467 F.2d 787, 795 (6th Cir.1972). On the contrary, publicizing the increased severity of the FAA's new sanctions policy was essential to achieving its stated aim of enhanced deterrence. *See* POSNER, *supra,* at 242–43 ("Viewed in an economic perspective as a system for altering incentives and thus regulating behavior, law must also be public"). That is no doubt why the agency did in fact publish it.

Because we conclude that the new sanctions policy "affected" the public within the meaning of the APA, we hold that the FAA could not rely upon this policy in Smith's case. Bulletin 86–2 was made available to the public only after Smith had run afoul of the underlying substantive rule and the APA therefore precludes its use against him.

### B. *The NTSB's Reliance Upon Bulletin 86–2*

█ In the alternative, the NTSB argues that, whatever the FAA may have done, the NTSB did not rely upon Bulletin 86–2 in upholding the FAA's 60–day suspension of Smith's license. The Board is administratively independent of the FAA and it was not bound to follow the FAA Bulletin; thus, whatever procedural mistake the FAA may have made in assessing the initial sanction against the petitioner, we are told, it does not infect the NTSB's final decision affirming the FAA's suspension of the petitioner's license.

The procedural history of this case indicates, however, that the NTSB decision did effectively rely upon FAA Bulletin 86–2.

Recall that the FAA's 60–day suspension order relied upon Bulletin 86–2, and that the ALJ reduced the period of Smith's suspension to 45 days because of certain extenuating circumstances. The NTSB then reinstated the original 60–day suspension solely, it appears, out of deference to the FAA's sanction policy. *See* NTSB Order and Opinion, *supra,* at 8 ("in cases when all violations alleged by the Administrator are affirmed, it is incumbent on the law judge to offer 'clear and compelling reasons' supporting any reduction in sanctions"). *See also* NTSB Supplementation of Record on Remand, No. EA–3469, at 2 (January 8, 1992) (noting that the NTSB "has generally deferred to the FAA's imposition of a 60–day suspension for this class of offenses").

The NTSB decision does not itself refer to Bulletin 86–2, but it need not do so in order to depend upon it. By deferring to the FAA's sanction policy and reinstating the original suspension, the NTSB's decision ultimately rests upon the FAA's decision and upon the Bulletin that improperly underlay that decision. The Board cannot be upheld insofar as it adopted as its own the FAA's invalid basis, and having suggested no alternate basis for reinstating the FAA's chosen sanction, the Board cannot be upheld upon its own account.

### III. CONCLUSION

For the foregoing reasons, the order of the NTSB affirming the suspension of the petitioner's license is vacated and the matter is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*