475 S.E.2d 280

Michael McCOMAS, Winifred Andrews, and Mary Blackwell, Petitioners Below, Appellees,

v.

BOARD OF EDUCATION OF FAYETTE COUNTY; Philip J. Tissue, President; W. Jack Flint, Ralph L. Parks, Daniel E. Wright, and Jeanne M. Young, Respondents Below,

Board of Education of Fayette County, Appellant.

No. 23291.

Supreme Court of Appeals of West Virginia.

Submitted March 5, 1996.

Decided May 17, 1996.

Barry L. Bruce, Lewisburg, for Appellees.

Erwin L. Conrad, Fayetteville, for Appellants.

CLECKLEY, Justice:

The respondent below and appellant herein, the Board of Education of Fayette County (Board),[1] appeals an order of the Circuit Court of Fayette County granting a writ of mandamus to the petitioners below and appellees herein, Michael McComas, Winifred Andrews, and Mary Blackwell, who are taxpayers and residents of Fayette County.

I.

## FACTUAL AND PROCEDURAL HISTORY

At a meeting held on January 3, 1995, the Board, pursuant to W.Va.Code, 18–5–13 (1990), and W.Va.Code, 18–5–13a (1991), scheduled a public hearing on the proposed plan to close Falls View Elementary School and Gauley Bridge High School, and to consolidate Gauley Bridge High School with Valley High School. As required by W.Va.Code, 18–5–13a, notice of the hearing was published in two newspapers of general circulation in Fayette County for four successive weeks prior to the February 16, 1995, public meeting.

On January 12, 1995, copies of the plan for consolidation and closure and supportive materials were placed in the Board's office for inspection by the public. The documents were made available for five successive weeks.[2] According to the Board, no one examined any of the documentation held in the Superintendent's office. Between January 4, 1995, and February 16, 1995, several articles appeared in *The Fayette Tribune,* *The Beckley Register,* and *The Charleston Gazette* discussing the planned closure and noting that other information was available in the Superintendent's office. During this period, the Board claims it visited Gauley Bridge High School to conduct a meeting with the local school improvement council so that members of the public would have the opportunity to discuss the closures and any other issues with the Board.

1. The individual Board members were respondents below, but do not appear as appellants herein.

2. W.Va.Code, 18–5–13a, only requires that such materials be made available to the public for four successive weeks.

The Board posted notices on the front door and two separate bulletin boards, and made available materials concerning the closures of Gauley Bridge High School and Falls View Elementary School. The principals of Gauley Bridge High School and Falls View Elementary School made presentations to the staff members concerning the effect of the closures. Representatives of the West Virginia Education Association and the American Federation of Teachers also made presentations. Other meetings involving faculty, citizens, and members of a committee against consolidation also occurred during the period prior to the public hearing.

The petitioners presented their opposition to the Board's closure and consolidation plan at the public meeting held on February 16, 1995. Purportedly because of the voluminous materials presented to the Board by the petitioners, Jack Flint, a member of the Board, requested an opportunity to ask the Superintendent questions. The Superintendent and Mr. Flint agreed to meet on February 19, 1995. Mr. Flint advised two other Board members, Ralph L. Parks and Daniel E. Wright, that he was meeting with the Superintendent and that they could come and listen if they wanted.[3] The Board's brief to this Court notes that Mr. Flint, Mr. Parks, and the president of the Board, Phillip J. Tissue, all arrived separately for the discussion with the Superintendent on February 19, 1995. The Superintendent testified[4] that besides himself, the following individuals were present on February 19: Jack Crist, the associate superintendent, Ray Carson, associate superintendent for finance administration, Mr. Tissue, Mr. Flint, Mr. Wright, and Mr. Parks.

The Board claims none of the people present (except Flint and the Superintendent) specifically planned with anyone else to show up on February 19, 1995; nothing was convened; no formalities were followed; and no votes were taken or resolutions adopted. Moreover, the Board asserts none of the members present discussed the questions posed by Mr. Flint, and no one voiced an opinion concerning the proposed plans. Ultimately, at the public meeting on February 20, 1995, the final vote of the Board was 4 to 1 in favor of closing Falls View Elementary School, and 3 to 2 in favor of consolidated Gauley Bridge High School.[5]

The petitioners filed a petition seeking a writ of mandamus and for injunctive relief in the circuit court. A hearing was held on March 15, 1995. In the final order dated November 9, 1995, which incorporated two prior orders entered on May 15, 1995, and October 5, 1995, the circuit court granted the petition for a writ of mandamus. The circuit court stated that the two reasons for granting the writ were that the Board's vote for the closure and consolidation of the schools was *void ab initio* due to violations of the notice and posting requirements of W.Va. Code, 18–5–13, and W.Va.Code, 18–5–13a, and because the Board conducted a meeting in violation of the Open Governmental Proceedings Act embodied in W.Va.Code, 6–9A–1, *et seq.* (the Sunshine Law). The Board appeals alleging several errors.

## II.

### DISCUSSION

W.Va.Code, 53–1–2 (1933), and Section 6 of Article VIII of the West Virginia Constitution vest the circuit courts of this state the power to issue writs of mandamus. Because mandamus is a drastic remedy to be invoked only in extraordinary situations, a party seeking such a writ must satisfy three conditions: (1) there are no other adequate means for the party to obtain the desired relief; (2) the party has a clear and indisputable right to the issuance of the writ; and (3) there is a legal duty on the part of the

---

3. According to the minutes of the February 20, 1995, meeting, one of the members of the audience asked if there was a meeting held on February 19, 1995. The response was that Mr. Flint informed Mr. Wright and Mr. Parks, but Board member Jeanne M. Young was not contacted.

4. The Superintendent made this testimony during a hearing held on March 15, 1995, before the circuit court.

5. The petitioners noted there was no open discussion by the Board members concerning the documents presented by the petitioners to the Board on February 16, 1995.

respondent to do that which the petitioner seeks to compel. *See* Syl. Pt. 1, *State ex rel. Billings v. Point Pleasant,* 194 W.Va. 301, 460 S.E.2d 436 (1995). The issuance of a writ of mandamus is normally inappropriate unless the right or duty to be enforced is nondiscretionary. The importance of the term "nondiscretionary" cannot be overstated—the judiciary cannot infringe on the decision-making left to the executive branch's prerogative.

■ It is axiomatic that a school board has authority to close and/or consolidate schools. *See Haynes v. Board of Educ.,* 181 W.Va. 435, 383 S.E.2d 67 (1989); W.Va.Code, 18–5–13. Thus, courts may not interfere with the decisions of a school board without strong evidence justifying such interference. A school board's powers are not unlimited, however; and, a writ of mandamus is appropriate when a board oversteps, or fails to meet, its clear legal duties. *See generally Board of Educ. v. West Virginia Bd. of Educ.,* 184 W.Va. 1; 399 S.E.2d 31 (1990). As we stated in Syllabus Point 1 of *Pell v. Board of Education of Monroe County,* 188 W.Va. 718, 426 S.E.2d 510 (1992):

> " 'Mandamus will lie to control a board of education in the exercise of its discretion upon a showing of caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of the law.' Syl. pt. 4, *Dillon v. Board of Education,* 177 W.Va. 145, 351 S.E.2d 58 (1986)."

*See also* Syl. Pt. 1, *Haynes v. Board of Educ., supra.* Thus, the use of mandamus is appropriate to confine an administrative agency to a lawful exercise of its authority when compelled to do so by statute.

The parties to this appeal raise several issues regarding the procedure followed by the Board in its attempt to consolidate the two schools. Despite the numerous issues, we limit our disposition of this appeal to the question of whether the circuit court erred when it ruled the Board violated the Sunshine law and the notice-posting requirements of W.Va.Code, 18–5–13a. Because we hold the Board violated both laws and mandamus was proper in this case, we affirm the ruling below. We do not reach the remaining issues, which concern alleged shortcomings in the Board's procedures, as the Board can easily avoid those pitfalls if it decides to repeat the process.

## A.

### The Sunshine Law

#### 1.

#### The Standard of Review

■ This appeal concerns the circuit court's decisions to grant a writ of mandamus based upon its finding that a violation of the Open Governmental Proceedings Act, also called the sunshine law, contained in W.Va. Code, 6–9A–1, *et seq,* and to void the Board's school consolidation vote. Our standard of review in mandamus actions was recently stated in *Staten v. Dean,* 195 W.Va. 57, 464 S.E.2d 576 (1995), and in *State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 470 S.E.2d 162 (1996). In Syllabus Point 1 of *Staten, supra,* we found: "The standard of appellate review of a circuit court's order granting relief through the extraordinary writ of mandamus is de novo." However, "[w]e review a circuit court's underlying factual findings under a clearly erroneous standard." *Staten v. Dean,* 195 W.Va. at 62, 464 S.E.2d at 581. This means, as we stated in *Cooper,* that "we consider *de novo* whether the legal prerequisites for mandamus relief are present." 196 W.Va. at 214, 470 S.E.2d at 168. As to other underlying issues, we review either for an abuse of discretion or under a clearly erroneous standard.

#### 2.

#### The Violation

On February 19, 1995, four out of five of the Board's members, the superintendent, and two vice superintendents met at the Board's central office. The circuit court ultimately ruled this gathering, which was held out of the presence of the public, was a meeting in violation of the Sunshine Law. As a result of this violation, the circuit court voided the Board's vote taken at the February 20, 1995, public hearing in favor of the school closings and consolidation plan. The Board contests the circuit court's findings,

asserting the February 19, 1995, meeting was merely an information gathering session that did not fall within the prohibitions set out in W.Va.Code, 6–9A–1, *et seq.*[6]

■ The West Virginia Legislature has decreed that meetings by government entities should be public. W. Va.Code, 6–9A–3 (1987), provides that "all meetings of any governing body shall be open to the public."[7] There is no question that the members of the Fayette County Board of Education constitute a "governing body" subject to the Sunshine Law's requirements.[8] The only issue is whether the gathering on February 19, 1995, was a "meeting" for purposes of the law.

■ W.Va.Code, 6–9A–2(4) contains the Act's definition of "meeting":

" 'Meeting' means the convening of a governing body of a public body for which a quorum is required in order to make a

decision or to deliberate toward a decision on any matter, but such term does not include (a) any meeting for the purpose of making an adjudicatory decision in any quasi-judicial, administrative or court of claims proceeding, (b) any on-site inspection of any project or program, or (c) any political party caucus[.]"

In *Appalachian Power Company v. Public Service Commission,* 162 W.Va. 839, 844, 253 S.E.2d 377, 381 (1979), this Court discussed what "activities, processes or assemblages fall within the Act's definition of a meeting[.]"[9] We concluded W.Va.Code, 6–9A–2(4)'s "meeting" applies to "a convening of a governing body of a public body if the convening is for the purpose of making a decision or deliberating toward a decision, and if some statute or rule requires a quorum as a prerequisite to convening." *Appalachian*

**6.** We do not address the merits of the school closings and consolidation that were before the Board. Our only concern here is whether the circuit court erred in granting the petitioners a writ of mandamus voiding the actions taken during the February 20, 1995, meeting because the Board had failed to comply with the Sunshine Law on February 19, 1995.

**7.** W.Va.Code, 6–9A–3, provides, in pertinent part:

"Except as expressly and specifically otherwise provided by law, whether heretofore or hereinafter enacted, and except as provided in section four [§ 6–9A–4] of this article, all meetings of any governing body shall be open to the public. Any governing body may make and enforce reasonable rules and regulations for attendance and presentation at any meeting where there is not room enough for all members of the public who wish to attend, and this article shall not be construed to prohibit the removal from a meeting of any member of the public who is disrupting the meeting to the extent that orderly conduct of the meeting is compromised: Provided, That persons who desire to address the governing body shall not be required to register to address said body more than fifteen minutes prior to time the scheduled meeting is to commence.

"Each governing body shall promulgate rules by which the time and place of all regularly scheduled meetings and the time, place and purpose of all special meetings are made available, in advance, to the public and news media, except in the event of an emergency requiring immediate official action.

"Each governing body of the executive branch of the state shall file a notice of any meeting with the secretary of state for publica-

tion in the state register. Each notice shall state the time, place and purpose of the meeting. Each notice shall be filed in a manner to allow each notice to appear in the state register at least five days prior to the date of the meeting.

"In the event of an emergency requiring immediate official action, any governing body of the executive branch of the state may file an emergency meeting notice at any time prior to the meeting. The emergency meeting notice shall state the time, place and purpose of the meeting and the facts and circumstances of the emergency.

"Upon petition by any adversely affected party any court of competent jurisdiction may invalidate any action taken at any meeting for which notice did not comply with the requirements of this section."

**8.** W.Va.Code, 6–9A–2(3) (1993), defines "governing body" as "the members of any public body having the authority to make decisions for or recommendations to a public body on policy or administration, the membership of which governing body consists of two or more members." Subsection (6) of that provision defines "public body" as "any executive, legislative or administrative body or agency of this state or any political subdivision, or any commission, board, council, bureau, committee or subcommittee or any other agency of any of the foregoing," and Subsection (5) includes "county board of education" in its list of "political subdivision[s]."

**9.** *Appalachian Power* considered a prior version of W.Va.Code, 6–9A–2, however, the definition of "meeting" did not change in the subsequent enactments.

*Power,* 162 W.Va. at 844, 253 S.E.2d at 381.[10] In this case, the last element—whether the law requires school boards to have a quorum to do business—can be easily determined. The statutory provision governing the conduct of a board of education's business and meetings, W.Va.Code, 18-5-4 (1993),[11] provides for three kinds of meetings—regular, special, and emergency—and includes a quorum requirement: "A majority of the members shall constitute the quorum necessary for the transaction of official business." As to the remaining elements of a "meeting"— *i.e.,* convening and deliberation—*Appalachian Power* held that *"meetings* as the Act defines them will have members of the governing body present, and will involve the transaction of business." *Id.,* 162 W.Va. at 845, 253 S.E.2d at 382. (Emphasis in original.) Obviously, there were members of the Board present at the February 19th conference. Thus, we can now further narrow our inquiry to determine whether the Board members transacted business—i.e., made a

decision or deliberated toward a decision—on the nineteenth.

■ By imposing the openness requirement on governing bodies who "deliberate toward a decision on any matter," the Legislature clearly intended W.Va.Code, 6-9A-1, *et seq.,* to apply to those assemblies where discussions leading up to a decision take place. The statute also encompasses at least some meetings between board members and staff. As we stated in *Appalachian Power:*

"Consultations with staff, deliberation and making a decision are steps in a *process.* For our purposes they are not separate and distinct occurrences. Consultations, deliberations and making a decision are elements in a continuum. To attempt to separate this continuum into contrived components obstructs rather than facilitates interpretation of the Act." 162 W.Va. at 843, 253 S.E.2d at 381. (Emphasis in original.)

In this case, the petitioners below presented materials opposing the school closings and

**10.** The Court arrived at that "construction based upon the belief that the dependent clause 'for which a quorum is required ...' modifies the verbal phrase 'the convening.' The sentence thus construed indicates to the reader the particular characteristics a convening must possess to be a 'meeting.'" 162 W.Va. at 844, 253 S.E.2d at 381.

**11.** W.Va.Code, 18-5-4, provides, in pertinent part:

"The board shall meet on the first Monday of January, except that in the year one thousand nine hundred eighty-two, and every year thereafter, the board shall meet on the first Monday of July, and upon the dates provided by law for the laying of levies, and at such other times as the board may fix upon its records. At any meeting as authorized above and in compliance with the provisions of article four [§ 18-4-1, *et seq.*] of this chapter, the board may employ such qualified teachers, or those who will qualify by the time of entering upon their duties, necessary to fill existing or anticipated vacancies for the current or next ensuing school year. At a meeting of the board, on or before the first Monday of May, the superintendent shall furnish in writing to the board a list of those teachers to be considered for transfer and subsequent assignment for the next ensuing school year; all other teachers not so listed shall be considered as reassigned to the positions held at the time of this meeting. Such list of those recommended for transfer shall be

included in the minute record and the teachers so listed shall be notified in writing, which notice shall be delivered in writing, by certified mail, return receipt requested, to such teachers' last-known address within ten days following said board meeting, of their having been so recommended for transfer and subsequent assignment.

"Special meetings may be called by the president or any three members, but no business shall be transacted other than that designated in the call.

"In addition, a public hearing shall be held concerning the preliminary operating budget for the next fiscal year not less than ten days after such budget has been made available to the public for inspection and within a reasonable time prior to the submission of said budget to the state board for approval and at such hearing reasonable time shall be granted to any person or persons who wish to speak regarding parts or all of such budget. Notice of such hearing shall be published as a Class I legal advertisement in compliance with the provisions of article three [§ 59-3-1 *et seq.*], chapter fifty-nine of this code.

"A majority of the members shall constitute the quorum necessary for the transaction of official business.

"Board members may receive compensation at a rate not to exceed eighty dollars per meeting attended. But they shall not receive pay for more than fifty-two meetings in any one fiscal year."

consolidation plan to the Board at its public meeting on February 16, 1995. As a result one of the Board members, Mr. Flint, wanted an opportunity to ask questions of the Superintendent concerning the presented material. The two agreed to get together on Sunday, February 19, 1995. Mr. Flint then invited three other Board members to attend. All of the Board, except one member who was not informed of the session, went to hear the Superintendent's responses to Mr. Flint's questions. In addition to the Superintendent, two vice-superintendents (including the vice-superintendent over finances) were at the meeting. The attendees followed no formalities. There is evidence, however, that other Board members besides Mr. Flint may have asked a few questions. The meeting lasted approximately two hours. The next day at the scheduled public meeting, the Board permitted people to voice their concerns about the closings and consolidation. The Board, without much discussion, then voted to go forth with the closings and consolidation plan.

After stating the above facts, the circuit court found:

"[A] quorum of the Board of Education met on February 19, 1995, at the central office and discussed the issue of consolidating Gauley Bridge High School. This issue, which required a quorum vote, was later on February 20, 1995, voted upon by the board. The Court, therefore, finds that the meeting of February 19, 1995, was a meeting to deliberate toward a decision or a proposal on which a vote of the governing body is required at *any* meeting at which quorum is present." (Emphasis in original.)

Based on these facts and findings, it would be reasonable to conclude that the February 19th meeting was a meeting subject to the Act's requirements and should have been public. The Board contends, however, the Act was not violated because its members did not intend to circumvent the Act and because the absence of formalities removed the meeting from the Act's purview. We address those contentions in turn.

That the Board members may have gathered with good intentions and without the intent to violate the Act is not controlling here.[12] Neither the statute nor its rationale allow a blanket good faith defense. The operative language in W.Va.Code, 6–9A–3, does not mention any intent requirement; it simply reads "all meetings of any governing body shall be open to the public." The definition of "meeting" in subsection 2(4) could be read to limit the Act to those meetings called for the particular purpose of deliberating on or deciding an issue, but that provision cannot reasonably be construed to refer to a state of mind beyond a desire by the governing body members to talk business. Moreover, the Act's enforcement provision, W.Va.Code, 6–9A–6, authorizes courts to award the complaining persons their attorneys' fees and expenses "where the court finds that the governing body intentionally violated the provisions of this article[.]" There would be no need for the Legislature to limit fee recoveries to cases of intentional violations if there were no such thing as unintentional violations.

Given the goals of the Sunshine Law in promoting public awareness, public participation, and official accountability, focusing on the intent of governing body members would seem to be an empty undertaking. Courts in other jurisdictions have reached the same conclusion. "Intent ... is not a consideration in determining compliance with" the statute. *State ex rel. Randles v. Hill*, 66 Ohio St.3d 32, 34–35, 607 N.E.2d 458, 460 (1993). As noted by the court in *Blackford for Use and Benefit of Cherokee Junior High School Parent–Teacher Association v. School Board of Orange County*, 375 So.2d 578, 580 (Fla.App.1979), the question of whether there was an intentional violation "is not the point. School boards are not supposed to conduct their business in secret even though it may all be for the best at the end of the day and notwithstanding that the motives are as pure as driven snow." Accordingly, we reject the Board's argument that a lack of intent to violate the Act provides a statutory defense.

12. As we explain below, however, an intent to violate the Act can be relevant in some cases.

We do, however, agree with at least part of the Board's second contention: that is, not every gathering between or among members of a public body will constitute a meeting in violation of statutory mandates. To find otherwise would hamper the functioning of any governmental entity. Specifically, we concur that

> "[i]t would be unrealistic, indeed intolerable, to require of such professionals that every meeting, every contact, and every discussion with anyone from whom they would seek counsel or consultation to assist in acquiring the necessary information, data or intelligence needed to advise or guide the authority by whom they are employed, be a public meeting within the disciplines of the Sunshine Law. Neither the letter nor the spirit of the law require it." *Bennett v. Warden,* 333 So.2d 97, 100 (Fla.App.1976).

To distinguish between those informal gatherings that do not fit within W.Va.Code, 6–9A–1, *et seq.,* and those that do, we look first to the legislative purposes for enacting the Open Governmental Proceedings Act. West Virginia Code, 6–9A–1 (1975), sets forth the Legislature's reasoning for concluding it is in the best interest of the public that the various public entities of this State conduct their respective proceedings in public:

> "[P]ublic agencies, boards, commissions, governing bodies, councils and all other public bodies in this state exist for the singular purpose of representing citizens of this state in governmental affairs, and it is, therefore, in the best interests of the people of this state for all proceedings of all public bodies to be conducted in an open and public manner. The Legislature hereby further finds and declares that the citizens of this state do not yield their sover-

eignty to the governmental agencies which serve them. The people in delegating authority do not give their public servants the right to decide what is good for them to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments of government created by them."

This declaration, and the Act generally, implement grand and fundamental provisions in our State Constitution. Those provisions, adopted from Virginia's Declaration of Rights, proclaim the theory of our form of government and embrace Article II, § 2 (powers of government in citizens) [13] and Article III, § 2 (magistrates servants of people) [14] and § 3 (rights reserved to people).[15] Together they dramatically call for a political system in which the people are the sovereigns and those in government are their servants. Naturally, servants should be loathe to exclude their sovereigns from any substantive deliberations. As is obvious from the declaration of policy in W.Va.Code, 6–9A–1, that is precisely the sentiment inspired by the Sunshine Act.

From the legislative statement of policy and its constitutional underpinnings, it is clear this Court should accord an expansive reading to the Act's provisions to achieve its far-reaching goals. A narrow reading would frustrate the legislative intent and negate the purpose of the statute. *See State ex rel. Badke v. Village Board,* 173 Wis.2d 553, 570, 494 N.W.2d 408, 414 (1993) ("[t]he fundamental purpose of the open meeting law is to ensure the right of the public to be fully informed regarding the conduct of governmental business"). Moreover, we are concerned a narrow interpretation of the Act would invite avoidance tactics. Thus, a court

---

13. Article II, § 2 states, "The powers of government reside in all the citizens of the State, and can be rightfully exercised only in accordance with their will and appointment."

14. Article III, § 2 states, "All power is vested in, and consequently derived from, the people. Magistrates are their trustees and servants, and at all times amenable to them."

15. Article III, § 3 states, "Government is instituted for the common benefit, protection and secu-

rity of the people, nation or community. Of all its various forms that is the best, which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and when any government shall be found inadequate or contrary to these purposes, a majority of the community has an indubitable, inalienable, and indefeasible right to reform, alter or abolish it in such manner as shall be judged most conducive to the public weal."

applying the law should "push [its coverage] beyond debatable limits in order to block evasive techniques." *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors,* 263 Cal.App.2d 41, 50, 69 Cal.Rptr. 480, 487 (1968).[16] As the Florida court stated in *Town of Palm Beach v. Gradison,* 296 So.2d 473, 477 (Fla.1974):

> "One purpose of the government in the sunshine law was to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance. Rarely could there be any purpose to a nonpublic pre-meeting conference except to conduct some part of the decisional process behind closed doors. The statute should be construed so as to frustrate all evasive devices. This can be accomplished only by embracing the collective inquiry and discussion stages within the terms of the statute, as long as such inquiry and discussion is conducted by any committee or other authority appointed and established by a governmental agency, and relates to any matter on which foreseeable action will be taken."

▪ There is nothing in either W.Va. Code, 6–9A–1, *et seq.,* or in W.Va.Code, 18–5–4, which suggests the restrictions therein should not apply to both formal and informal meetings. Moreover, there is a circularity to the Board's argument that a failure to follow formal procedures (which are imposed on or adopted by public bodies to promote effective and democratic decision-making) or to keep minutes (as is required by W.Va.Code, 6–9A–5 (1978)) somehow justifies exclusion of the public. Two, or three, wrongs do not make a right.[17] It would be very inviting for public bodies to avoid the Sunshine Law by simply engaging in private discussions prior to a public meeting and formal vote. Thus, we explicitly reject the Board's contention that a gathering must have the formal trappings of a regular Board meeting for it to be a "meeting" within the Sunshine Law. *See State ex rel. Badke v. Village Board, supra.*

▪ Still, an interpretation of the Sunshine Law that precludes any off-the-record discussion between board members about board business would be both undesirable and unworkable—and possibly unconstitutional.[18] In drawing the line between those conversations outside the Law's requirements and those meetings within it, we think a common sense approach is required, one that focuses on the question of whether allowing a governing body to exclude the public from a particular meeting would undermine the Law's fundamental purposes that we have identified above.[19] Answering that question could involve addressing a number of criteria, none of which is controlling on its own. They include the content of the discussion, the number of members of the public body participating, the percentage of the public body that those in attendance represent, the significance of the identity of the absent members, the intentions of the members, the nature and degree of planning involved, the duration of the meeting and of the substantive discussion, the setting, and the possible effects on decision-making of holding the meeting in private.

▪ Obviously, the content of the discussion is crucial; school board members can gather in complete privacy as much as they want to discuss matters entirely unrelated to school business. The Sunshine Law becomes

---

16. *Superseded by statute as stated in Roberts v. City of Palmdale,* 9 Cal.Rptr.2d 501, *review granted and opinion superseded by* 12 Cal.Rptr.2d 326, 837 P.2d 94 (1992), *judgment reversed by* 5 Cal.4th 363, 20 Cal.Rptr.2d 330, 853 P.2d 496 (1993).

17. What the Board fails to acknowledge is that it is the absence of these formalities that may have persuaded the circuit court to find that a violation occurred.

18. Such a sweeping restriction on board members' ability to discuss certain public issues in a private manner would raise serious questions under the free speech provisions of the First Amendment to the United States Constitution and Article III, § 7 of the West Virginia Constitution. Under the construction of the Sunshine Law that we adopt today, however, those issues are avoided.

19. *See Sacramento Newspaper Guild v. Sacramento County Board of Supervisors,* 263 Cal.App.2d at 47, 69 Cal.Rptr. at 485 (an "[i]nterpretation requires inquiry into the ... [act's] objective and into the functional character of the gatherings or sessions to which the legislature intended it to apply").

relevant, however, once the topic of discussion turns to school issues and threatens to become a deliberation.[20] Numbers are also relevant; there is a difference between two members of a twenty-member public body having a conversation and fifteen of them having a cabal. At a certain point, the number of members participating gives the discussion an importance that requires the invitation of the public. On the other hand, even individual meetings, if privately held, can in some cases violate the Law. For example, in *Blackford,* 375 So.2d at 580, the court concluded that Florida's Sunshine Law had been violated when a school superintendent devised and executed a plan whereby board members came to his office seriatim and met individually with him about a proposed school redistricting plan. Similarly, where a governing body concocts a scheme with the specific intent to circumvent the Law, a court should not hesitate to declare the scheme illegal. Consideration of planning, duration, and setting takes into account, for example, that officials often have brief and unscheduled discussions, that these are necessary, and that permitting them to occur in private would not threaten the purposes of the Sunshine Law.[21] Finally, an examination of the effects of holding a meeting in private would look at the decision-making process as a whole to determine if the public has been deprived of a meaningful opportunity to respond to, or hold officials accountable for, their private deliberations.[22] The point is that the facts will vary dramatically from case to case, and they must be carefully examined in each instance to protect the legislative and constitutional designs.[23]

Other jurisdictions have examined the same criteria in deciding whether private, nontraditional sessions or gatherings at social events can violate the Sunshine Law. In *Blackford, supra,* a series of private meetings held between individual board members and the superintendent compelled the Florida court to find there had been a violation of the open meetings law. There were never enough members in one place to constitute a quorum to take official action in *Blackford,* but a violation was still found because of the nature of the meetings. *See also Bundren v. Peters,* 732 F.Supp. 1486, 1500 (E.D.Tenn., N.D.1989) (even a social gathering could "circumvent the spirit and letter of the Open Meetings Act"). Similarly, in *Stockton Newspapers, Inc. v. Members of Redevelopment Agency of City of Stockton,* 171 Cal. App.3d 95, 214 Cal.Rptr. 561 (1985), the California Court of Appeals held that a series of nonpublic telephone conversations between an agency and its attorney for the purpose of obtaining a commitment or promise by the majority of the body constituted a meeting within the purview of the statute. The court found the word "deliberation" "connotes not only collective discussion but also the 'collective acquisition and exchange of facts preliminary to the ultimate decision[.]' " 171 Cal. App.3d at 102, 214 Cal.Rptr. at 564. (Citation omitted). *See also Moberg v. Independent School Dist. No. 281,* 336 N.W.2d 510 (Minn.1983) (although social gatherings are exempt from the act, a quorum of board members cannot conduct business under the guise of a social event); *Van Hooser v. Warren County Bd. of Educ.,* 807 S.W.2d 230 (Tenn.1991) (although, generally board mem-

20. " '[O]nce any discussion, whatsoever, begins among the members of the public body regarding what action to take ... such discussion shall be open to the public and failure to do so shall constitute a clear violation of the Open Meeting Act.' " *Bundren v. Peters,* 732 F.Supp. 1486, 1501 (E.D.Tenn., N.D.1989), *quoting Smith County Educ. Ass'n v. Anderson,* 676 S.W.2d 328, 334 (Tenn.1984).

21. *See Bundren v. Peters,* 732 F.Supp. at 1500 (a social gathering at the Superintendent's house attended by various Board members was not a violation of the Tennessee Open Meetings act considering that, although the superintendent may have spoken to between two and four mem-

bers of the seven-member board, "he did not speak individually or in a group to all members or even about the same topics"); *Harris v. Nordquist,* 96 Or.App. 19, 771 P.2d 637 (Or.App.1989) (gathering at a restaurant of board members before and after an official board meeting did not constitute a meeting).

22. As we discuss below, the effects analysis is especially pertinent in deciding on what relief is appropriate in a particular case.

23. ·We caution, though, that our list of the relevant criteria is not necessarily exhaustive, and certainly our elaboration on the listed criteria is only illustrative.

bers conversing with attorney is exempt from statutory requirements, any decision made or deliberation toward a decision still constitutes a meeting under the open meetings act). In *Thuma v. Kroschel*, 506 N.W.2d 14 (Minn.App.1993), the Minnesota appellate court even sustained a finding that an eight-minute conference by a few members of a public entity could constitute a meeting in violation of the open meetings act. *See also Board of County Comm'rs of St. Joseph County v. Tinkham*, 491 N.E.2d 578 (Ind. App. 3 Dist.1986) (a thirty-minute meeting held immediately before scheduled meeting where official matters were discussed violated the law).

We come, finally, to examining the relevant criteria in this case to determine whether the meeting on February 19, 1995, was one of those incidental meetings that fall outside the requirements of the Sunshine Law. We find particularly significant the facts that four-fifths of the Board (a quorum) and the three highest ranking county administrators gathered with the purpose of addressing a highly topical matter of school business. That the discussion was a question-and-answer session in no way lessens the need for it to be public. Indeed, conveyance of information from the chief county administrator and proponent of a proposal that is of great importance, sensitivity, and controversy to the citizens of Fayette County would seem to be the very kind of program that *ought* to be before the public.[24] The meeting was prearranged, albeit in a very casual manner, it lasted two hours, took place at the county Board offices, and occurred the day before the crucial vote on the topic of the discussion. All of these criteria support the circuit court's conclusion

that this was a "meeting," as that term is used in the Sunshine Law.

Most telling of all, however, may be the effect on decision-making that could have resulted from the meeting's private setting. On the Thursday preceding Sunday the 19th, opponents of the consolidation presented the Board with materials that they apparently thought supported their position. Mr. Flint, conscientiously fulfilling his duties as a board member, reviewed the materials and concluded they did indeed raise serious questions in his mind. It was therefore most appropriate for Mr. Flint to address those questions to the Superintendent, the chief county administrator and the architect of the consolidation plan. It was not appropriate, however, to exact the answers to those questions in a private meeting. Essentially, Fayette County was in the middle of a debate on consolidation that put the Superintendent as proponent and the circuit court petitioners as opponents. Anyone who is the least bit familiar with advocacy knows that it is a whole lot easier to prevail in a debate when the opponent is absent. The dynamics are completely different, and they gave the Superintendent an inherent advantage not only in persuasion but also in any effort at building a coalition on the Board.[25] (That is, the dynamics encouraged an "us versus them" attitude among the persons at the meeting.) We do not question in the least the good faith of all those who attended the meeting on February 19th, but we cannot ignore that there was very little discussion of the proposal by the Board members at the public meeting on February 20th, preceding the Board's vote.[26] The two-hour meeting on

24. *See, e.g., State ex rel. Badke v. Village Board*, 173 Wis.2d at 572, 494 N.W.2d at 415: "Listening and exposing itself to facts, arguments and statements constitutes a crucial part of a governmental body's decisionmaking."

25. As noted by the court in *State ex rel. Newspapers v. Showers*, 135 Wis.2d 77, 90, 398 N.W.2d 154, 160 (1987), *quoting State ex rel. Lynch v. Conta*, 71 Wis.2d 662, 685–86, 239 N.W.2d 313, 330–31, *superseded by statute/rule as stated in State ex rel. Newspapers, Inc. v. Showers, supra* (1976):

"'Some occurrence at the session may forge an open or silent agreement. When the whole competent body convenes, this persuasive matter may or may not be presented in its entirety

to the public. Yet that persuasive occurrence may compel an automatic decision through the votes of the conference participants. The likelihood that the public and those members of the governmental body excluded from the private conference may never be exposed to the actual controlling rationale of a government decision thus defines such private quorum conferences as normally an evasion of the law. The possibility that a decision could be *influenced* dictates that compliance with the law be met.'" (Emphasis in original.)

26. *See Hardesty v. River View Local School District Board of Education*, 63 Ohio Misc.2d 145, 149, 620 N.E.2d 272, 274 (1993) (citation omitted): "[I]t is of no consequence that the final

February 19th, obviously deprived the public of hearing the Superintendent's responses to the questions raised by the petitioners' materials, of hearing the give-and-take of the Board's deliberations, and of holding both the elected and appointed public servants accountable for their reasoning. Not only did the process fail to afford any opportunity for members of the public or, more importantly, the dissenting Board member, to challenge the Superintendent's responses to questions, but it also created (at least) the appearance that public servants were deliberating behind closed doors and beyond the scrutiny of the sovereign. We believe these facts, and the other criteria discussed above, lead inexorably to the conclusion that permitting such meetings as that of February 19, 1995, to be held in private would seriously undermine the fundamental purposes of the Sunshine Law.

We therefore hold that a planned meeting among four-fifths of a school board to gather, review, or discuss information relevant to an issue before the board must be public, and if it is not, its conduct violates the Open Governmental Proceedings Act, W.Va.Code, 6–9A–3. We leave government officials with this guide: "When in doubt, the members of any board, agency, authority or commission should follow the open-meeting policy of the State." *Town of Palm Beach v. Gradison,* 296 So.2d at 477.

### 3.

### *The Remedy*

■■■ A finding that a violation occurred, however, does not necessarily require invalidation of all actions taken during or following

from the wrongfully held private meeting. The relevant statutory authority, W.Va.Code, 6–9A–6 (1993), leaves such matters in the court's discretion: "The court is empowered to compel compliance or enjoin non-compliance with the provisions of this article and to annul a decision made in violation thereof."

A decision made following an improper meeting may be upheld if the meeting in question fits within certain narrow exceptions or if subsequent action by the public body corrected the prior violation. *See e.g. Application of Dombroske,* 118 Misc.2d 800, 462 N.Y.S.2d 146, 149 (Sup.1983) (a "subsequent legal meeting may cure the prior illegality"); *Van Hooser v. Warren County Bd. of Educ., supra* (although there was a violation of the open meetings act, terminated teacher was not entitled to reinstatement considering dismissal was found warranted at a subsequent public hearing). After all, if a public body could not cure its violation, it might be forever locked into the position that was contrary to the action (or inaction) it took in the illegal meeting. Moreover, we are more comfortable with the broad reading we have given to the Sunshine Law, thus advancing the Law's salutary purposes, when we realize its impact in some cases—those at the margins—will be prospective only.

W.Va.Code, 6–9A–2(4), provides for three exceptions to the definition of a meeting. There is no violation to the meeting requirement if the gathering is quasi-judicial, an on-site inspection of a program or project, or a political party caucus. The February 19, 1995, meeting clearly did not fall within any of these exceptions.[27]

action was taken in an open meeting ... [considering] that action 'result[ed] from deliberations in a meeting not open to the public[.]' "

**27.** Furthermore, there is no evidence that the February 19 meeting could be considered an executive session under W.Va.Code, 6–9A–4 (1978), and thus, excepted from the open meetings requirement.

W.Va.Code, 6–9A–4, provides:

"No provision of this article shall be construed to prevent the governing body of a public body from holding an executive session during a regular, special or emergency meeting, after the presiding officer has identified the authorization under this article for the

holding of such executive session and has presented it to the governing body and to the general public, but no decision shall be made in such executive session.

"An executive session may be held only upon a majority affirmative vote of the members present of the governing body of a public body as defined in this article for the following:

"(1) Matters of war, threatened attack from a foreign power, civil insurrection or riot; or

"(2) The appointment, employment, retirement, promotion, demotion, disciplining, resignation, discharge, dismissal or compensation of any public officer or employee, or other personnel matters, or for the purpose of conducting a hearing on a complaint against a public officer or employee, unless such public

Nor were there in this case subsequent ameliorating circumstances that corrected the illegal meeting. We have already described in the preceding subsection that we believe the violation in this case was serious, if unintended, and that it may well have had a substantial effect on the decision-making process. We believe those facts—seriousness of the violation, intent, and possible effects—to be the most important considerations in fashioning an appropriate remedy and, in this case, their combination means any corrective action would have to be of a very significant nature. It may well be that nothing short of starting the entire process over could have provided an adequate cure. Indeed, in *Kramer v. Board of Adjustment, Sea Girt*, 80 N.J.Super. 454, 194 A.2d 26 (1963), a board of adjustment met in three executive sessions to deliberate and vote on whether a variance should be granted. Later concerned about the legality of their action, the board published a notice, held further meetings, and voted again four months after the executive sessions. The court held that the subsequent meetings were not within the spirit of the act and did not remedy the prior violation. *See also Scott v. Town of Bloomfield*, 94 N.J.Super. 592, 600, 229 A.2d 667, 671 [28] ("public was entitled to hear [the] ... discussion and ... [the] vote * * * [and a subsequent meeting that] was merely a perfunctory rerun of the action ... [did] not cure any defect"). Here, the only possible corrective step that the Board could point to

was its public meeting on February 20, 1995, when it voted on the closing and consolidation issues. Not only was that meeting perfunctory in terms of Board discussion and analysis of the issues, there was no recounting of the contents of the Board's discussion when it met on February 19th. Regardless of what efforts would have been sufficient to overcome the violation, it is clear what did occur was not enough.

For the aforementioned reasons, we hold the circuit court did not abuse its discretion when it found that the meeting on February 19, 1995, violated W.Va.Code, 6–9A–1, *et seq.* There is sufficient evidence in the record to support the circuit court's finding. We further note that determining what constitutes a meeting in violation of the open meetings statute is a fact specific inquiry to which we give great deference. Finally, we conclude that the circuit court correctly voided the vote of the School Board taken at its February 20, 1995, meeting. If the Board wants to revisit the issue of school closings and consolidation, it must repeat the prescribed statutory procedure. *See* W.Va. Code, 18–5–13a.

### B.

### *Affected School Under W.Va.Code, 18–5–13a* [29]

The Board's next argument is that the circuit court erred in finding Valley High

---

officer or employee requests an open meeting; or

"(3) The disciplining, suspension or expulsion of any student in any public school or public college or university, unless such student requests an open meeting; or

"(4) The issuance, effecting, denial, suspension or revocation of a license, certificate or registration under the laws of this state or any political subdivision, unless the person seeking such license, certificate or registration or whose license, certificate or registration was denied, suspended or revoked requests an open meeting; or

"(5) The physical or mental health of any person, unless such person requests an open meeting; or

"(6) Matters which, if discussed in public, would be likely to affect adversely the reputation of any person; or

"(7) Any official investigation or matters relating to crime prevention or law enforcement; or

"(8) The development of security personnel or devices; or

"(9) Matters involving or affecting the purchase, sale or lease of property, advance construction planning, the investment of public funds or other matters involving competition which, if made public, might adversely affect the financial or other interest of the state or any political subdivision."

Moreover, W.Va.Code, 6–9A–2(2), defines an executive session as "any meeting or part of a meeting of a governing body which is closed to the public[.]"

**28.** *Aff'd* 98 N.J.Super. 321, 237 A.2d 297 (1967), *app. dis.* 52 N.J. 473, 246 A.2d 129 (1968).

**29.** The Board assigns several other errors pointing mainly to the circuit court's findings of violations of various procedural requirements under W.Va.Code, 18–5–13a. We do not need to discuss most of these errors at this point, either

School was an "affected school" under the closings and consolidation plan and, as such, must also have notices of the Board's proposal posted to satisfy the requirements of W.Va.Code, 18–5–13a.[30]

Under W.Va.Code, 18–5–13a, a school board is required to post a copy of the same notice as that published in the newspaper in conspicuous places in affected schools for the benefit of employees. The provision specifically states, in part: "A copy of such notice shall be posted at the affected school in conspicuous working places for all profession-

al and service personnel to observe, and such notice shall remain posted for four successive weeks prior to the date of the required public hearing." Moreover, closing and consolidation plans by county boards of education are "further subject to any current rules and regulations of the state board of education relating to school closing or consolidation[.]" W.Va.Code, 18–5–13a. The Board disagrees with the circuit court's finding[31] under this statute that notice posting at the affected schools will have to be repeated because of its finding that required postings were not made at all of the affected schools in a con-

because they have no merit or because we are affirming on other grounds. The Board will have to again satisfy the requirements of W.Va. Code, 18–5–13a, in order to close or consolidate the schools. We do, however, discuss this one point of conflict because of the potential that another problem may arise while trying to fulfill the requirements of W.Va.Code, 18–5–13a, the next time.

30. W.Va.Code, 18–5–13a, reads, in part:
    "In addition to the provisions of section thirteen [§ 18–5–13] of this article, prior to any final decision of a county board of education on any proposal to close or consolidate any school, except in cases in which a construction bond issue was passed by the voters and which bond issue included the schools to be closed or consolidated, the county board of education shall:
    "(1) Prepare and reduce to writing its reasons and supporting data regarding such school closing or consolidation. The written reasons required under this section shall be available for public inspection in the office of the county school superintendent during the four successive weeks before the date of the public hearing required by this section; and
    "(2) Provide for a public hearing, notice of which shall be advertised by publication in a newspaper of general circulation in the locality *of the affected school* at least *once a week* for four successive weeks prior to the date of the hearing. The notice shall contain the time and place of the hearing and the proposed action of the school board. A copy of such notice shall be posted at the affected school in conspicuous working places for all professional and service personnel to observe, and such notice shall remain posted for four successive weeks prior to the date of the required public hearing. At least a quorum of the school board members and the county superintendent from the county wherein the affected school is located shall attend and be present at the public hearing. Members of the public shall have the right to be present, to submit statements and testimony, and to question county school officials at the public hearing.

"Any such proposal to close or consolidate any school by any county board of education shall be further subject to any current rules and regulations of the state board of education relating to school closing or consolidation[.]"

31. Construing the above portion of statute, the circuit court made the following finding:
    "The second paragraph of the statute [W.Va. Code, 18–5–13a,] further requires that notice be posted at the *affected* schools in conspicuous working places for all professional and service personnel to observe. Evidence on this issue is that notice was forwarded to the schools, Falls View and Gauley Bridge High School, with instructions to post on the door of the school and the public bulletin board. Affidavits were also received into evidence that indicate the principals of Falls View and Gauley Bridge High School posted the notices as directed and further state that these locations were the two most conspicuous places at the school where professional and service personnel would likely to see the notice. (sic) The placing of the notices in the location directed by the memo from the Board of Education is questionable from the evidence of record.
    "The evidence does not show in this case that the notices required to be posted at the affected school in conspicuous working places for all professional and service personnel to observe were properly placed to give the particular class of employees, that being the professional and service personnel, notice or that the notices were actually placed at the 'affected school.' The evidence is that Falls View is to be closed and Gauley Bridge High School is to be consolidated with Valley High School. Notices were posted at Falls View and Gauley Bridge High School, but there is no evidence that notice of any type was posted at Valley High School, which the Court finds to be one of the affected schools."
    The Board's last argument was that the circuit court erred in finding that the notices of the *school closings and consolidation plan were not* posted in conspicuous places.

spicuous place. However, the language of the statute itself does not suggest what should be considered an affected school in a school consolidation case. Thus, we limit our discussion under this error to the definition of the words "affected schools" to assist a trier of fact in any future analysis of this language.[32]

The Board argues, in part, that we should look to Policy 6200 (1995), promulgated by the West Virginia Department of Education, to give content to the words "affected schools." According to the Board's brief, Policy 6200 distinguishes between closing and consolidated schools and "receiving schools." Under this argument, a school board is required to post notices for closure or consolidation in only those schools targeted for closure or consolidation as opposed to those who are receiving schools.

Section 105 of Policy 6200 covers the rules for the closing and consolidation of schools. Several provisions of Policy 6200 make reference to the obligations of a school board in relation to schools "targeted for closure or consolidation" and those schools "which will receive students affected." In fact, Section 105.07, which contains the provisions for notices and public hearing requirements, mirrors W.Va.Code, 18–5–13, and W.Va.Code, 18–5–13a, in many respects. Section 105.07.C. states: "Copies of the notice of public hearing must also be posted in the school *targeted* for closure or consolidation in conspicuous working places for professional and service personnel to observe and shall remain posted for four successive weeks." (Emphasis added).

■■■■■ Policy 6200 is not a legislative rule, instead it is a rule exempted from the ordinary requirements for legislative rule-making; thus, it is entitled only to the deference it is due.[33] After comparing Section 105.07.C. with W.Va.Code, 18–5–13, and W.Va.Code, 18–5–13a, it is apparent Section 105.07.C. is inconsistent with the statutory provisions. While it is true that we generally give some deference to policy provisions of this nature, we will not defer to interpretations that conflict with the statute they pur-

---

**32.** After examining the above findings, it is unclear whether the circuit court found a violation of W.Va.Code, 18–5–13a, because the Board failed to post the notices in the most conspicuous places at which the notices were posted or because the Board failed to consider Valley High School as an affected school that required notices as well. There was not enough evidence in the record to determine whether the notices were actually posted in the most conspicuous places. If this is the circuit court's finding, the circuit court failed to explain why these notices were not in a conspicuous place. *Black's Law Dictionary* 309 (6th ed. 1990) defines the words "conspicuous place" as "[w]ithin the meaning of a statute relating to the posting of notices, a 'conspicuous place' means one which is reasonably calculated to impart the information in question." Various other authorities construing statutes with posting requirements use a similar definition to define the words "conspicuous place." The standard usually used to determine whether a particular notice is reasonably calculated to inform is the reasonable person standard. *See R.S. Oglesby Co., Inc. v. Lindsey*, 112 Va. 767, 72 S.E. 672 (1911); *Standard Oil Co. of Louisiana v. United States*, 33 C.C.P.A. 152 (1946); Ralph D. Mawdsley, Ph.D., J.D., *Age Discrimination in Education: A New Amendment and New Problems*, 38 WELR 387 (1987).

In any event, there are insufficient facts listed in the record to determine whether the notices posted were actually posted in conspicuous

places in the schools where they were posted and, considering that these postings will have to be repeated as a result of the open meetings violation, this point deserves little comment. Thus, the circuit court should examine whether the places notices are posted adequately meet the Code provisions.

**33.** *See generally* W.Va.Code, 29A–3B–1, *et seq.*; *West Virginia Bd. of Educ. v. Hechler*, 180 W.Va. 451, 376 S.E.2d 839 (1988).

Because the parties never argued the type of rule Policy 6200 is and the persuasive effect it should have, we assume, without deciding, that Policy 6200 is like an interpretive rule. As such, it is entitled to some deference, but it is not entitled to the full level of deference and analysis given to a legislative rule. As we discussed in *Appalachian Power Co. v. State Tax Department*, 195 W.Va. 573, 583, 466 S.E.2d 424, 434 (1995):
  "Interpretive rules, on the other hand, do not create rights but merely clarify an existing statute or regulation. ... Because they only clarify existing law, interpretive rules need not go through the legislative authorization process.... Although they are entitled to some deference from the courts, ... interpretive rules do not have the force of law nor are they irrevocably binding on the agency or the court.... They are entitled on judicial review only to the weight that their inherent persuasiveness commands." (Citations and footnotes omitted.)

port to cover. Policy 6200 interprets the word "affected" in a very narrow and arbitrary fashion. Of course, the word "affected" must be limited in some fashion. However, as with the open meetings act discussed above, it is clear the Legislature intended a broad interpretation of the statutory provisions. As we stated in *State ex rel. Jones v. Board of Education of Ritchie County*, 178 W.Va. 378, 381, 359 S.E.2d 606, 609 (1987): "The obvious intent of the statute is to insure that the public is aware of and has an opportunity to contribute to the county board's decision regarding consolidating or closing schools." Thus, limiting the term "affected schools" only to those actually targeted for closure and consolidation eliminates an entire series of schools that might be directly and substantially affected.

Because Policy 6200 conflicts with the statute and the statute itself does not define the phrase in question, we must examine the ordinary usage of the word "affect" for assistance. *Black's Law Dictionary* at 57 (6th Edition 1990) gives the following definition for the word "affect": "To act upon; influence; change; enlarge or abridge; often used in the sense of acting injuriously upon persons or things. To lay hold of or attack ...; to act or produce an effect or result upon; ... to touch."

█ From the ordinary meaning of these words, we ascertain that "affect" generally means to have an impact on something. We cannot use this word in its broadest sense because this would lead to ridiculous results—every school in an area would then fall within the posting requirement because even a minimal increase in faculty or student population as a result of school consolidations or closings would affect another school. Although when interpreting statutes we give credence to the normal usage of the word, we will not construe strictly language so as to produce ridiculous results. In order to limit the language but yet still embrace the broad legislative goals of this statute, we find that the use of the word "affected" in the context of the statute suggests a more direct relationship between the proposed action and the targeted school. Any tenuous relationship between the action and a school will not qualify. Finding that there is a direct and substantial relationship between the proposal and the potential impact on a particular school ensures all schools that will be substantially impacted by the drastic changes that a school closing or consolidation will bring were given sufficient information in a timely fashion so that a response can be formulated.

We leave the circuit courts the discretion to engage in a case-by-case analysis to determine what school might be an affected school within the meaning of the statute. In order to determine if a particular school qualifies as an "affected school," a circuit court should ask whether the school in question will be "touched sufficiently" by the school board's proposal. *Railway Labor Executives' Ass'n v. United States*, 216 F.Supp. 101, 102 (E.D.Va.1963). In other words, will a proposal for school closing or consolidation have a real and measurable impact on a specific school, or will the effects be "too indirect or attenuated materially to affect" the school in question? *Smith v. National Transp. Safety Bd.*, 981 F.2d 1326, 1328, 299 U.S.App.D.C. 124, 126 (1993).

Acknowledging the appropriate standard for reviewing whether a school is an "affected school" does not end our analysis. The next issue that must be analyzed is whether consolidating a school necessarily implies that only those schools actually losing their identity as opposed to those receiving students could be affected by a closing or consolidation proposal. For this we examine the normal definition of the word "consolidate." "Consolidate" has been defined as:

"In a general sense, to unite or unify into one mass or body, as to consolidate several small school districts into a large district, or to consolidate various funds.... The term means something more than to rearrange or redivide.

"To make solid or firm; to unite, compress, or pack together and form into a more compact mass, body, or system. To cause to become united and extinguished in a superior right or estate by both becoming vested in the same person." *Black's Law Dictionary* at 308 (6th Edition 1990).

The Board suggests that in a school consolidation case the affected school is only the school that is sending students to another school. We reject this interpretation. We see no evidence within the statute to suggest there should be a distinction made between the "giving" and "receiving" school. Including receiving schools in the definition acknowledges the special problems and issues that will naturally arise from blending student populations. To make such a distinction is completely arbitrary and a strained reading of the statute. Moreover, it is evident that some schools would fit under the aforementioned definition of affected. To follow the Board's analysis would require this Court to accept the idea that those schools remaining to which students would be added under a consolidation plan undergo no significant changes. However, the Board's argument is flawed.

The very definition of the word "consolidate" indicates at least two separate entities are transformed into an entirely new entity. Under the proposal, Valley High School and Gauley Bridge High School are to be consolidated. The school building and grounds of Valley High are apparently to remain open while Gauley Bridge's will close. Obviously, if the closing and consolidation plan goes through, there will be significant changes not only to Gauley Bridge High School's but to Valley High School's educational program as well.[34] Notably, Valley High School would have to plan for a massive influx of new students and possibly faculty—this could mean rearranging even the most insignificant process to accommodate new students.[35] Although it is not possible to set up hard and fast rules for such a fact-intensive analysis, certainly any school specifically mentioned in a proposal that would be greatly changed if the plans are carried through would qualify as an affected school under W.Va.Code, 18–5–13a.

The Board also argues that Valley High School is not an affected school because "the mission and identity of Valley High School will continue without being changed except for the fact that it will receive certain of the students from Gauley Bridge High School." Unlike the Board claims, the school's identity cannot remain the same because of such a massive influx of students. A consolidation program by its very nature involves sudden and massive changes to the complexion of the school environment; it is a massive influx (or decrease, as the case may be) that is more than the usual ebb and flow of the student body or curriculum during an average school year.

To say that Valley High School is not "affected" by the consolidation plan simply because it is a receiving school is ludicrous. There are no such linguistic limitations evident in the statute as suggested by the Board—in other words, the phrase "affected school" means "only the school or schools targeted for closure or consolidated into another school." Because of the aforementioned reasons, we affirm the judgment of the Circuit Court of Fayette County on this issue and now hold that, at a minimum, all schools that are the objects of consolidation whether "giving" or "receiving" schools can qualify as affected schools within the meaning of W.Va.Code, 18–5–13a.[36]

## III.

## CONCLUSION

We are mindful that restricting our disposition to these narrow grounds leaves some significant issues unresolved, and that these issues are fraught with consequences. These issues, mostly procedural flaws, can be avoided. The School Board is well aware of the issues and should carefully attempt to prevent them from being an issue in any future litigation. The judicial task, properly under-

**34.** If the petitioners' brief is accurate, Valley High School's student population could increase by as much as sixty-six percent.

**35.** For example, the number of books, supplies, and even meals prepared would increase. There is the potential for a higher student/teacher ratio and the school would be forced to plan and provide for basic educational requirements, ex-

tracurricular activities, and even orientation sessions for new students and faculty.

**36.** We leave it to a circuit court's discretion to determine whether any school not specifically mentioned in a proposal could be an affected school under W.Va.Code, 18–5–13a.

stood, should concentrate on those questions that must be decided in order to resolve a specific case. Courts must resist the temptation to pluck issues from the stalk before their time. This is especially true when unsettled issues of broad public concern are afoot. In this sense, the science of horticulture is like the art of judging: yearning for the blossom when only the bud is ready enhances the growth of neither the flower nor the law.

For the foregoing reasons, the decision of the Circuit Court of Fayette County is affirmed.

Affirmed.