No. 23-ICA-248 - *HD Media Company, LLC d/b/a Charleston Gazette-Mail v. West Virginia University Board of Governors*

**FILED**

**July 23, 2024**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

SCARR, C. J., concurring, in part, and dissenting, in part:

I write separately from the majority to concur in part and dissent in part. I concur with the majority opinion's analysis and conclusion that the circuit court was correct in reading the WVOGPA's nonpublic matter exception, West Virginia Code § 6-9A-4(b)(12), consistently with the WVFOIA's internal memoranda exception, West Virginia Code § 29B-1-4(a)(8).[1] I concur with the majority in concluding that the *Peters* cases[2] do not expressly require an *in-camera* evidentiary hearing with in-person testimony whenever or in all circumstances that a governing body asserts attorney-client privilege as a basis to avoid the open meetings mandate, and that the circuit court had a sufficient basis for its decision that the attorney-client privilege was applicable. I concur with the majority opinion's conclusion that the circuit court did not abuse its discretion nor did it commit reversible error in refusing to award attorney fees pursuant to West Virginia Code § 6-9A-7(b) (1999) due to the Board's notice violations. Finally, I dissent to the majority's holding related to the scope of the commercial competition exception to

---

[1] Throughout this separate opinion, I will attempt to continue to use the defined terms used in the majority opinion.

[2] For purposes of this separate opinion, *Peters v. Cnty Comm'n of Wood Cnty*, 205 W. Va. 481, 519 S.E.2d 179 (1999) will be referred to as *Peters I*. *Peters v. Cnty Comm'n of Wood Cnty*, 209 W. Va. 94, 543 S.E.2d 651 (2000) (per curiam) will be referred to as *Peters II*. Reference to *Peters* without a specific citation shall refer to both cases collectively.

1

the WVOGPA and its conclusion that the Board met its burden to establish the applicability of the exception.

In terms of the notice violations, like the majority, I agree with the circuit court, and I concur with the majority's affirmation of the circuit court's ruling, that a violation of the meeting notice requirements occurred. I also agree with the majority that there is absolutely no such thing as a merely "technical" violation of the notice requirements. To describe a violation as technical, as did the circuit court, minimizes the importance and potential impact of a violation, particularly given the mandatory nature and fundamental purpose and goals of the WVOGPA and the clear intent of the Legislature. For this reason, I write separately to emphasize this issue and the Court's holding.

After providing as clear and strong a pronouncement of its legislative intent as it ever has, *see* W. Va. Code § 6-9A-1 (Declaration of legislative policy), the Legislature made it abundantly clear that "**all** meetings of **any** governing body **shall** be open to the public." W. Va. Code § 6-9A-3(a) (emphasis added). Next, demonstrating the importance of the open meetings mandate and consistent with the declared legislative intent, and to encourage members of the public to attend and participate in such meetings, the Legislature set forth in detail specific notice requirements with which every governing body must comply in advance of its meetings. *See* W. Va. Code § 6-9A-3. Included among

2

them, governing bodies must provide notice of the date, time, place, and purpose of the meeting, with the meeting agenda, sufficiently in advance of the meeting to provide a meaningful opportunity for interested members of the public to know the purpose of the meeting and what will be discussed. *Id.* at §§(d)-(h). By doing so, members of the public can make an informed decision about whether they want to attend the meeting, observe, and participate in the discussion.

The circuit court found that the Board violated the WVOGPA by publishing an inadequate meeting agenda with only generic descriptions, insufficient to provide enough information to adequately place the public on notice that any of the six topics at issue would be discussed at the June 19, 2020, meeting. Nevertheless, the circuit court concluded that the violation was "technical," essentially concluding as a result that the violation did not warrant an award of attorney fees or invalidate any of the actions taken at the June 19, 2020, meeting.[3] In fact, in *McComas v. Bd. of Educ. of Fayette Cnty.*, the Supreme Court of Appeals noted that neither the statute nor its rationale allows a blanket good faith defense; there is no intent requirement for there to be a violation. 197 W. Va. 188, 196, 475 S.E.2d 280, 288 (1996). Relying in part upon a 2015 unpublished memorandum decision of the Supreme Court of Appeals of West Virginia ("Supreme Court of Appeals") directly on point, the circuit court found the generic language used in

---

[3] In *Peters II*, 209 W. Va. 94, 543 S.E.2d 651 (2000) (per curiam), the Supreme Court of Appeals of West Virginia also found the circuit court's description of the violation as "technical" insufficient to justify either the violation or the circuit court's failure to take appropriate action in response to it.

the agenda with the notice was simply not sufficient to advise the public, in advance of the meeting, about the specific topics and issues that were scheduled to be discussed. *See Capriotti v. Jefferson Cnty. Plan. Comm'n.*, No. 13-1243, 2015 WL 869318 (W. Va. Feb. 26, 2015) (memorandum decision).[4]

In *Capriotti*, the plaintiff challenged the adequacy of the notice of a Commission meeting based on a reference in the meeting agenda which simply stated, "Reports from Legal Counsel and legal advice to P[lanning] C[omission]." During the meeting, when the Commission came to this agenda item, a motion to go into closed executive session was made and approved. In deciding whether the agenda notice was adequate under the WVOGPA, the Supreme Court of Appeals explained the purpose behind publishing an agenda before any public meeting:

> The plain language of W. Va. Code § 6-9A-3 expressly requires a public body to make available to the public, in advance of a scheduled meeting, the agenda for said meeting. **The purpose of this notice requirement is to fulfill the**

---

[4] The Supreme Court of Appeals has authorized citing and relying on unpublished memorandum decisions, especially when there is no published opinion that would serve as well. *See* W. Va. R. App. P. 21(e) ("Memorandum decisions may be cited in any court or administrative tribunal in this state…."*)*; Syl. Pt. 5, *State v. McKinley* 234 W. Va. 143, 764 S.E.2d 303 (2014) ("While memorandum decisions may be cited as legal authority, and are legal precedent, their value as precedent is necessarily more limited; where a conflict exists between a published opinion and a memorandum decision, the published opinion controls."); *cf. State v. Myers,* 216 W. Va. 120, 126 n.10, 602 S.E.2d 796, 802 n.10 (2004) (citing an unpublished decision from Iowa and noting that although the court "normally does not cite unpublished decisions…. [G]iven the dearth of published decisions dealing with the issue before us, we necessarily rely on several unpublished decisions.").

**Legislature's stated policy of maintaining an "[o]pen government" and providing "public access to information."** W. Va. Code § 6-9A-1 (1999)(Repl. Vol. 2010). Such openness is intended to "allow[] the public to educate itself about government decisionmaking through individuals' attendance and participation at government functions … and public debate on issues deliberated within the government." *Id*. By the same token,

> [p]ublic access to information promotes attendance at meetings … and encourages more … complete discussion of issues by participating officials. The government also benefits from openness because … public input allow[s] government agencies to gauge public preferences accurately and thereby tailor their actions and policies more closely to public needs….

*Id*.

*Capriotti*, 2015 WL 869318, at *5-6. (emphasis added).

After reviewing the purposes behind publishing a notice before a public meeting, the Supreme Court of Appeals concluded that the particular notice at issue was in violation of the WVOGPA, explaining:

> **Despite these statutory directives aimed at providing notice to interested individuals of the topics to be discussed at the meetings of public bodies, the agenda notice provided by the Planning Commission …was not adequate to inform the Petitioners, and other members of the public, that it planned to discuss the FAF litigation or a proposed settlement thereof. Rather, the agenda's generic reference to "legal advice" provided no indication**

5

> **whatsoever that the ongoing FAF proceedings would be a topic of discussion at [the meeting].** Because the agenda notice did not adequately inform the public of the specific items to be considered at the …meeting, we find that the Planning Commission violated W. Va. Code § 6-9A-3….

*Capriotti* 2015 WL 869318 at *6. (emphasis added). *Capriotti* makes clear that under the WVOGPA, using generic language and descriptions in an agenda notice is simply not sufficient to effectively advise the public about the specific topics that are going to be discussed.

Obviously, if the notice does not include a specific and adequately detailed description of the topics and issues to be discussed at the meeting, it is impossible for members of the public to discern if something will be discussed at the meeting about which they have an interest, and possibly have something to contribute to the discussion. Without adequate notice, they are prevented, in the first instance, from making an informed decision whether to attend the meeting, thereby undermining the fundamental purpose and goals of the WVOGPA. It is not a technical violation of the WVOGPA notice requirements when it relates to providing information to the public about the purpose of the meeting and the specific topics that will be considered and discussed.[5]

---

[5] In addition to *Capriotti,* the Gazette has cited several Advisory Opinions from the Ethics Commission requiring that the notice employ "language that will reasonably place the public and the media on notice of the particular items that will be considered during each meeting. Generic descriptions are insufficient to satisfy this requirement."

In this case, Respondent's June 19, 2020, Meeting Agenda did not mention that it was going to discuss: the business college, emergency pay policy, federal Title IX regulations, tuition and fees, capital projects, or a talk with the athletic director concerning the outlook for the upcoming season. Even if these topics had been listed in the Meeting Agenda in this fashion, the descriptions would have been inadequate to provide the public the notice required under the WVOGPA.

It should be absolutely clear that all of the notice requirements of the WVOGPA are essential to the purpose and goals of the WVOGPA and are to be strictly applied and followed in all instances. This conclusion is completely consistent and congruous with the commonsense approach and expansive reading of the WVOGPA mandated by the Supreme Court of Appeals in *Peters I,* 205 W. Va. at 488, 519 S.E.2d at 186.

I also agree with the majority in concluding that the *Peters* cases do not expressly require an *in-camera* evidentiary hearing with in-person testimony whenever or in all circumstances that a governing body asserts attorney-client privilege as a basis to avoid the open meetings requirements of the WVOGPA. That said, I believe it is

https://ethics.wv.gov/SiteCollectionDocuments/PDF%/20Open%20Meeting%20Opinions/OMAO%202009-04.pdf.

7

important to review in more detail the circumstances in the *Peters* cases and what the court actually said and did.

In *Peters I*, the circuit court, relying on the Commission's assertion of attorney-client privilege and its representation as to the subject matter of the communications, granted the Commission summary judgment and dismissed the action. Upon review, the Supreme Court of Appeals pointed out that the circuit court did not know the nature and actual substance of the communications and, therefore, could not make an informed decision whether the communications were covered by the attorney-client privilege. *See Peters I*. The Court noted that based on "these factual inadequacies," it did not know either, and accordingly, remanded the case with direction to the circuit court to conduct an *in-camera* hearing to determine whether the communications did indeed fall within the privilege. *Id*. at 484-90, 519 S.E.2d at 182-88. The *in-camera* hearing was necessary so the circuit court could learn, without disclosure to the opposing party, the actual substance of the communications and the privileged information. Without that information, there was no basis for either the trial court or the appellate court reviewing its decision to evaluate and determine if the privilege applies.

Upon remand, despite the Commission's suggestion to the circuit court that it conduct an *in-camera* evidentiary hearing, the circuit court merely engaged in an *in-camera* review of the written meeting minutes, concluding that was all that *Peters I*

8

required. Upon a second appeal, the Supreme Court of Appeals again remanded the case since, not surprisingly, all the written minutes provided was the subject matter of the communications, not their substance. The Court instructed the circuit court:

> to hold an in camera hearing to determine whether or not the communications that occurred during the three closed meetings fell within the limited attorney-client privilege as enunciated in *Peters*. In this regard, the circuit court must examine the substance of the communications that occurred between the Commissioners and their attorney during the three meetings in order to determine if the meetings fell within the attorney-client privilege.

*Peters II,* 209 W. Va. at 97-98, 543 S.E.2d at 654-55.

*Peters* can reasonably be interpreted to require an *in-camera* evidentiary hearing with in-person testimony when the attorney-client privilege is asserted. It can also be read and interpreted simply to indicate that under the circumstances in that case it was necessary, but the Court did not intend to mandate such a procedure in all such instances, which would interfere with the judgment and discretion of the circuit court handling the case. Speaking for myself, I certainly hesitate, and do not believe it is the role of the Intermediate Court of Appeals of West Virginia, to impose such a mandatory procedure and restrict the discretion of circuit courts solely on the basis of a possible alternative interpretation of the *Peters* cases.

Nevertheless, it is important to again note that in *Peters*, the Supreme Court of Appeals twice remanded the case for an *in-camera* evidentiary hearing, and the second remand made it clear that, in that case, witness testimony was required at the hearing. The court held that a bare assertion of attorney-client privilege is insufficient to justify closure of a meeting. *Peters I*, 205 W. Va. at 490, 519 S.E.2d at 188. A bare assertion of privilege does not provide information necessary to determine the nature and substance of the specific communications at issue. There was no recording of the meeting for the court to consider in evaluating the assertion and the substance of the specific communications. Also, the court at least implied a preference for first-hand, primary evidence involving meeting participants, rather than secondary, filtered evidence when attempting to determine the nature and substance of the communications and whether they fall within the limited attorney-client privilege.

While an *in-camera* evidentiary hearing with in-person testimony may not be a required procedure in all cases, in many, if not most instances, such a practice and procedure would be beneficial to the circuit court in conducting a meaningful evaluation of the privilege assertion, particularly given the usual factual nature of such an evaluation. Moreover, such a procedure would provide the circuit court with the opportunity for meaningful follow up inquiry not readily available when reliance is limited exclusively to meeting minutes or attorney prepared affidavits that do not include specifics of the actual communications at issue.

10

Any time there is a question whether the communications at issue are protected by the attorney-client privilege, the court must determine that the communications involved, or were made for the purpose of obtaining, legal advice as opposed to non-legal advice such as business, accounting, marketing, personnel management, non-legal risk management, media, or personal advice, or involved a simple recitation of the law without analysis or commentary, none of which qualify for the attorney-client privilege. *See State ex. rel. United Hosp. Ctr., Inc. v. Bedell*, 199 W. Va. 316, 326, 484 S.E.2d 199, 209 (1997) ("[T]he advice must be sought … from [the] attorney in his capacity as a legal advisor" and the advice must have involved legal advice.); Syl. Pt. 2, *State v. Burton*, 163 W. Va. 40, 254 S.E.2d 129 (1979) ("[T]he advice must be sought by the client from the attorney **in his capacity as a legal advisor.**") (emphasis added); 98 C.J.S. *Witnesses* § 343, Westlaw (database updated May 2024) ("Information outside the legal professional realm is not privileged, such as information for personal, business, investigatory, or technical services."); 98 C.J.S. *Witnesses* § 344, Westlaw (database updated May 2024) ("The privilege is inapplicable if the advice sought is not legal advice…"); Syl. Pt. 7, *State ex rel. U.S. Fidelity & Guar. Co. v. Canady*, 194 W. Va. 431, 460 S.E.2d 677 (1995).

Therefore, anytime there is an assertion of attorney-client privilege it is necessary for the court to know more than the subject matter of the communications. It

is necessary for the circuit court to know the actual substance of the communications which can only occur through an *in-camera* review. In a given situation the *in-camera* review may involve listening to a recording of the meeting and communications, hearing oral testimony of participants in the meeting, reviewing detailed minutes of the meeting which set forth the actual substance of communications, or conducting an *in-camera* review of affidavits or sworn statements from the participants recounting their recollection of the substance of the communications.

In this particular case, the circuit court did not conduct an *in-camera* review of any recording of the meeting and did not conduct an *in-camera* hearing with witness testimony to learn the substance of the communications. Instead, the circuit court conducted an *in-camera* review of the affidavit of West Virginia University's ("University") General Counsel, Stephanie Taylor, and an August 7, 2020, internal memorandum from Ms. Taylor which included recommendations for bringing the University's rules into compliance with the updated Title IX requirements. Based on these documents, the circuit court had more detailed and substantive information about the nature and substance of the communications at issue. The documents appear to demonstrate that the communications involved more than a mere recitation as to the changes in and current state of the law under Title IX at the June 19, 2020, meeting. They included a discussion of a plan for implementing changes to the University's rules so they would be in compliance with the law. To the extent the communications did not go beyond

a recitation of the changes and current state of the law, they appear to have been provided for the purpose of subsequently providing legal advice concerning required and recommended changes to the University's rules to ensure compliance with Title IX, which occurred in a subsequent August 14, 2020, meeting.[6]

My primary reason for writing separately is, that while I find most of the majority opinion well-reasoned and undoubtedly well intentioned, I must dissent to the majority's holding that, in this instance, the Board had satisfied its burden to establish the applicability of the "commercial competition" exception to all the matters and topics at issue.[7] Of even greater significance beyond this individual case, the majority's ruling requires me to further dissent to the expansion of the scope and overly broad definition and construction of the "commercial competition" exception applied by the majority, which I find inconsistent with the purpose and goals of the WVOGPA, and effectively creates an absurd result, an exception that swallows the rule.

---

[6] In considering this issue, the circuit court and this Court reviewed the unredacted version of Ms. Taylor's affidavit, and the August 7, 2020, internal memorandum, both of which were helpful in evaluating the substance of the communications, although the redacted version of Ms. Taylor's affidavit provides marginally sufficient information to support the circuit court's decision concerning the June 19, 2020, meeting. There does not appear to be any significant question that the August 14, 2020, meeting involved legal advice constituting privileged communications.

[7] The Title IX topic involved the attorney-client privilege issue; The Board did not contend, and the circuit court did not find, that it was subject to the commercial competition exception.

As correctly noted by the majority, the WVOGPA, codified at West Virginia Code § 6-9A-1 *et seq*., makes it the public policy of West Virginia that all meetings conducted by government entities "must be open to the public." As noted previously, the Legislature made its intent abundantly clear in its Declaration of legislative policy. W. Va. Code § 6-9A-1. There is no need to search, speculate, or assume the legislative intent. The Legislature specifically found and declared that public agencies and bodies in this state exist for the singular purpose of representing citizens of this state in governmental affairs, and that it is, therefore, "in the best interests of the people of this state for the proceedings of public agencies be conducted openly, with only a few clearly defined exceptions."[8] *Id.*

---

[8] In *McComas*, the Supreme Court of Appeals engages in a detailed, helpful discussion of the Legislature's declaration of intent. As part of that discussion, it notes that:

> This declaration, and the Act generally, implement grand and fundamental provisions in our State Constitution. Those provisions, adopted from Virginia's Declaration of Rights, proclaim the theory of our form of government and embrace Article II, § 2 (powers of government in citizens) and Article III, § 2 (magistrates servants of people) and § 3 (rights reserved to people). Together they dramatically call for a political system in which the people are the sovereigns and those in government are their servants. Naturally, servants should be loathe to exclude their sovereigns from any substantive deliberations. As is obvious from the declaration of policy in W. Va. Code, 6-9A-1, that is precisely the sentiment inspired by the Sunshine Act.

197 W. Va. 188, 197, 475 S.E.2d 280, 289 (Footnotes omitted).

The Legislature went further and declared that "the citizens of this state do not yield their sovereignty to the governmental agencies that serve them" and that in delegating authority, "[t]he people…do not give their public servants the right to decide what is good for them to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments of government created by them." *Id.* The Legislature noted that open government allows the public to educate itself about government decision-making through individuals' attendance and participation at government functions, distribution of government information by the press or interested citizens, and public debate on issues deliberated within the government. The Legislature even specifically noted the benefits of public input to issues being considered and for the government agencies to be able to gauge public preferences accurately.

In making this declaration, the Legislature clearly recognized the benefits of open transparent government, even though at times decision makers in government, like in business, would prefer not to have their consideration of issues and decisions subject to public scrutiny, debate, and criticism. In fact, commonly, the more difficult the circumstances and decision, the greater the desire to avoid outside scrutiny, but arguably that is when transparency, public participation, debate, and input is needed most. However, "[t]he fundamental purpose of the open meeting law is to ensure the right of the public to be fully informed regarding the conduct of governmental business."

*McComas v. Bd. of Educ. of Fayette Cnty.*, 197 W. Va. 188, 197, 475 S.E.2d 280, 289 (1996) (quoting *State ex rel. Badke v. Village Bd.*, 494 N. W. 2d 408, 414 (Wis. 1993)). According to *McComas*, "[f]rom the legislative statement of policy and its constitutional underpinnings, it is clear this Court should accord an expansive reading to the Act's provisions to achieve its far-reaching goals. A narrow reading would frustrate the legislative intent and negate the purpose of the statute." *Id.* at 197, 475 S.E.2d at 289.

While emphasizing the importance of open and transparent meetings, the Legislature did recognize the need for some exceptions to the open meeting requirements in certain limited and specifically enumerated situations. *See* W. Va. Code § 6-9A-4(b) ("A public agency may hold an executive session and exclude the public only when a closed session is required for any of the following actions…."). As currently written, the WVOGPA has twelve enumerated exceptions which are to be strictly and narrowly construed.[9] As indicated in *Peters I*, the court should "accord an expansive reading to the Act's provisions to achieve its far-reaching goals," 205 W. Va. at 487, 519 S.E.2d at 185

---

[9] As Justice Benjamin noted in his separate concurring and dissenting opinion in *Teets v. Miller*, 237 W. Va. 473, 486, 788 S.E.2d 1,14 (2016), "[t]he Act admits of limited exceptions that authorize a public agency to convene an executive session….and they have been narrowly construed and enforced…." *Cf.* Syl. Pt. 4, *Hechler v. Casey*, 175 W. Va. 434, 333 S.E.2d 799 (1985) ("The disclosure provisions of this State's Freedom of Information Act, … are to be liberally construed, and the exemptions to such Act are to be strictly construed.") (citation omitted); *see generally* 3B Sutherland Statutory Construction § 73.10, Westlaw (database updated November 2023) ("To protect … core aspirations of American participatory democracy, courts liberally construe [open meeting] statutes regulating the conduct of public affairs, and strictly construe exemptions to such laws.") (Footnotes omitted).

16

(internal quotation marks omitted) (quoting *McComas v. Bd. of Ed.*, 197 W. Va. at 197, 475 S.E.2d at 289), and exceptions "must be narrowly drawn so as to not abrogate the spirit and purpose of the Act." 205 W. Va. at 489, 519 S.E.2d at 187 (citing *Stockton Newspapers, Inc. v. Members of the Redevelopment Agency*, 171 Cal. App. 3d 95, 214 Cal. Rptr. 561 (Ct. App. 1985) (referring to the attorney-client privilege exception to California's open meetings act)).

Moreover, as the majority holds, and consistent with West Virginia law generally,[10] it remains the burden of the governing body seeking application of the exception to the open meetings requirements to establish that it is applicable and appropriate. *Cf.* Syl. Pt. 7, *Queen v. W. Va. Univ. Hosps., Inc.*, 179 W. Va. 95, 365 S.E.2d 375 (1987) (the party claiming an exception from FOIA general disclosure requirements has the burden of showing applicability of the exception); *Highland Min. Co. v. W. Va. Univ. Sch. of Med.*, 235 W. Va. 370, 390, 774 S.E.2d 36, 56 (2015) (the party asserting the personal privacy exception to FOIA bears the burden of proof to establish the applicability of the exception); *Gray Media Group, Inc. v. W. Va. Dept. of Health &*

---

[10] Syl. Pt. 3, *State ex rel. United Hosp. Ctr., Inc. v. Bedell*, 199 W. Va. 316, 484 S.E.2d 199 (1997) (burden of establishing attorney-client privilege or work product exception, in all their elements, always rests upon person asserting it); *State v. Lacy*, 196 W. Va. 104, 111, 468 S.E.2d 719, 726 (1996) (the burden of proof is with the party asserting the exception to the warrant requirement to establish that the exception is legitimate and not pretextual); *Zirkle v. Winkler*, 214 W. Va. 19, 24, 585 S.E.2d 19, 24 (2003) (the burden of establishing the independent contractor defense exception to respondeat superior lies on the party asserting the exception).

17

*Human Res.*, __W. Va.__, __S.E.2d__, 2024 WL 2349994, at *5 (Ct. App. May 23, 2024) (same). The party seeking to enforce the open meetings requirements has no burden of proof, although it certainly may wish to challenge evidence offered by the governing body or offer its own evidence if it so chooses.

The so-called "commercial competition" exception, W. Va. Code § 6-9A-4(b)(9), like some of the other WVOGPA exceptions, is not directly or specifically defined,[11] and has not been addressed in any detail by the Supreme Court of Appeals. Instead, the exception is explained and defined by three examples followed by the phrase "or other matters involving commercial competition." Accordingly, the term must be understood in the context of the WVOGPA, and this Court must apply and rely on the generally accepted rules of statutory construction to determine the meaning of "commercial competition" within West Virginia Code § 6-9A-4(b)(9), with the Legislature's intent being paramount. I agree with the majority's abbreviated summary of the rules of statutory construction but do not believe the rules were followed.

West Virginia Code § 6-9A-4(b)(9), provides that a governmental body may go into closed session to consider matters involving or affecting: the purchase, sale or lease of property; advance construction planning; or the investment of public funds; or

---

[11] The exception has no heading and no definition beyond the language in the exception.

"other matters involving commercial competition, which if made public, might adversely affect the financial or other interest of the state…." The exception further provides that the non-disclosure is temporary and applies "only until the commercial competition has been finalized and completed."

Applying the rules and principles of statutory construction, where general words or a general phrase in a statute follow a list of particular classes or examples, the general words or phrase must be read and construed, and controlled and limited, by the specific examples. *See Meadows v. Wal-Mart Stores. Inc*., 207 W. Va. 203, 214-15, 350 S.E.2d 676, 687-88 (1999) (general words are to be given their ordinary and familiar meaning and general words are to be interpreted by the words surrounding them.); Syl. Pt. 2, *Parkins v. Londeree*, 146 W. Va. 1051, 124 S.E.2d 471 (1962) ("[W]here general words follow the enumeration of particular classes of persons or things, the general words, under the rule of construction known as *ejusdem generis*, will be construed as applicable only to persons or things of the same general nature or class as those enumerated, unless an intention to the contrary is clearly shown."); Syl. Pt. 2, *W. Va. Dept. of Highways v. Farmer*, 159 W. Va. 823, 226 S.E.2d 717 (1976) ("[W]here general words follow words of a particular and specific meaning, such general words are not to be construed in their widest extent but are held to apply only to things of the same kind, class or nature as those specifically mentioned.").

Under the doctrine of *ejusdem generis*, "[w]here general words are used in a contract after specific terms, the general words will be limited in their meaning or restricted to things of like kind and nature with those specified." …The phrase *noscitur a sociis* literally means "it is known from its associates," and the doctrine implies that the meaning of a general word is or may be known from the meaning of accompanying specific words…The doctrines are similar in nature, and their application holds that in an ambiguous phrase mixing general words with specific words, <u>the general words are not construed broadly but are restricted to a sense analogous to the specific words</u>.

*Murray v. State Farm Fire and Casualty Co.*, 203 W. Va. 477, 485, 509 S.E.2d 1, 9 (1998). (emphasis added).

The Supreme Court of Appeals further explained in *Parkins* that the *ejusdem generis* rule of construction is "based on the obvious reason that if the legislature had intended the general words to be used in their unrestricted sense, they would have made no mention of the particular classes." 146 W. Va. at 1061-62, 124 S.E.2d at 477 (citations omitted). The Court further indicated that "[u]nder this rule of construction, general words do not amplify particular terms preceding them, but are themselves restricted and explained by the particular terms." *Id.* at 1062, 124 S.E.2d at 477; *see also West Virginia Consolidated Public Retirement Board v. Clark*, 245 W. Va. 510, 520, 859 S.E.2d 453, 463 (2021).

In this case, the phrase "or other matters involving commercial competition" must be viewed as an extension of, in the same category and class as, and is not amplified but limited by, the three prior examples and definitions: purchase, sale or lease of property; advance construction planning; and investment of public funds. While I do not agree with the Gazette's argument that only decisions, transactions, and actions involving public funds qualify for the exception, all three of the examples, by their nature, create a situation where advance or premature public disclosure "might" adversely affect the interests of the governmental body. Certainly, practically speaking, there is the potential that if there is public disclosure of any of these three activities, other individuals or entities, whether generally competitors or not, may take actions which compete with and might adversely affect the governing body. For example, they may seek to purchase or bid on, or compete for the property involved, or take other action to interject themselves into the transaction and conduct under consideration by the governing body, and thereby compete with and adversely affect it. Conceivably, third parties might decide to make their own investment based on information regarding the University's planned investment which might adversely affect the University. It is these types of situations and context which must be used in construing the general phrase "or other matters involving commercial competition." Moreover, the fact that the three examples on this list clearly contemplate by their nature a specific decision, transaction, or action in process or under consideration which is subject to "finalization and completion," further supports the view that the "commercial competition" exception must also involve a specific decision, transaction, or contemplated action, subject to

21

finalization and completion, not simply some amorphous general competition that is a constant.

As interpreted and construed by the circuit court, and by the majority, "commercial competition" would necessarily include any action or decision under consideration which might impact some student's decision to attend or not attend the University. Under this overly broad definition, almost any academic, athletic, facilities, social, entertainment, arts, safety and security issues, decisions and policies could implicate "commercial competition." Under the Board's and majority's view, adoption of a grading policy change in academic course offerings; installation of lighting, sidewalks, and vending machines; and athletic, social, and entertainment schedules and offerings would arguably involve commercial competition because they might impact a candidate's decision, enrollment, and the University's ubiquitous competition with other educational institutions.

While in a specific situation, a decision of a specific prospective student or specific faculty candidate being recruited by the University to attend the University may satisfy the definition,[12] a general theoretical impact on regular on-going competition is

---

[12] For example, a university trying to recruit a well-known lecturer, or gifted researcher, might want to keep its negotiations concerning a proposed compensation and benefits package, or even the fact that a potential hire was considering a change of employer, confidential until the negotiations had been concluded. Similarly, a school

not what is contemplated. Otherwise, as noted by the majority and by the Supreme Court of Appeals, a narrow interpretation of the WVOGPA, *i.e.* broad exceptions, might invite governing bodies to engage in avoidance tactics and evasive techniques, including overclassifying matters as involving commercial competition to avoid public disclosure, participation, and scrutiny. "[W]e are concerned a narrow interpretation of the Act would invite avoidance tactics. Thus, a court applying the law should 'push [its coverage] beyond debatable limits in order to block evasive techniques.'" *McComas v. Bd. of Educ. of Fayette Cnty.*, 197 W. Va. 188, 197-198, 475 S.E.2d 280, 289-290 (1996).

The expansive scope of the commercial competition exception adopted by the majority is an extreme position. In this instance, the exception would consume, swallow, and vitiate the open meeting rule and undermine the WVOGPA's stated purpose. The Gazette suggests it amounts to repeal of the rule. In either case, this type of result is generally sought to be avoided. *State v. Barefield*, 240 W. Va. 587, 599, 814 S.E.2d 250, 262 (2018) (citing *State v. Hatton*, 389 N.W.2d 229 (Minn. Ct. App. 1986)) (the application of the inevitable discovery exception to the exclusionary rule as advocated would "swallow" the entire Fourth Amendment and render its protections meaningless). Moreover, the position adopted by the majority inevitably produces an absurd result which courts are duty bound to avoid, particularly when the results are at odds with the

---

might want to keep discussions with a talented student athlete it was trying to recruit from being prematurely disclosed.

legislative intent. *Vanderpool v. Hunt*, 241 W. Va. 254, 262, 823 S.E.2d 526, 534 (2019) ("Such parsing of the statutory language achieves an absurd result that is simply not permitted under our rules of statutory construction."); *Taylor-Hurley v. Mingo Co. Bd. of Ed.*, 209 W. Va. 780, 787, S.E.2d 702, 709 (2001) ("[I]t is this Court's duty to avoid whenever possible a construction of a statute which leads to absurd, inconsistent, unjust or unreasonable results…. This does not mean, however, that we are at liberty to substitute their own policy judgments for those of the Legislature…."); *Click v. Click*, 98 W. Va. 419, __, 127 S.E.2d 194, 198 (1925) ("It is always presumed, in regard to a statute, that no absurd or unreasonable result was intended by the Legislature.") *see also In re D.K.*, 248 W.Va. 699, 704, 889 S.E.2d 781, 786 (Ct. App. 2023) (Scarr, J., dissenting).

In its opinion, the majority notes that "[w]hile the canons of construction can be helpful tools, they cannot override the intent of the Legislature…." It then proceeds to make the unsupported leap in logic, finding that in this case these two canons of statutory construction, *i.e.* "*ejusdem generis* and *noscitur a sociis* are inapplicable here" because they allegedly override or thwart the legislative intent. However, considering the clear legislative intent of the WVOGPA, particularly given Justice Cleckley's guidance and commonsense approach, the expansive definition of the "commercial competition" exception adopted by the majority thwarts and undermines the WVOGPA's fundamental purpose. Syl. Pt. 4, *McComas v. Bd. of Educ. of Fayette Cnty.*,

24

197 W. Va. 188, 475 S.E.2d 280 (1996). As intended, in this case the application of these canons of statutory construction actually preserves and supports the legislative intent.

Recognizing the potential problems its holding may create, the majority attempts to justify it, while at the same time limiting it. The majority indicates that due to the "unique challenges arising from developing a Covid-19 response, we conclude that under these circumstances, the Board has met its burden to demonstrate the applicability of the commercial competition exception." It then indicates that "our holding in this case on this point is a narrow one, founded in the extraordinary circumstances faced by the Board in the summer of 2020…." While one might reasonably sympathize with the Board having to deal with the national pandemic, that is not a valid basis to ignore the statute, its legislative intent, and the obligations it creates. In this case, the majority expands the commercial competition exception to the point that it creates a new exception that simply does not exist, an exception that ultimately swallows the rule. Again, as indicated, it is exactly these types of complex, unique and extraordinary circumstances, and difficult decisions that would benefit from transparency and public participation, debate, and input. The majority, recognizing the potential for abuse, even warns that the "exemption must be applied with care and restraint, and we caution lower courts to remain wary of governing bodies overclassifying matters as 'other matters involving commercial competition.'"

At various points in its opinion, the majority also reminds us that no specific action was taken or decision made during the closed meetings at issue and, therefore, there is nothing to invalidate pursuant to West Virginia Code § 6-9A-3(i). While that may be true, it does not diminish the importance and mandatory nature of the open meetings requirement and does not justify in any given case implicitly approving or excusing a violation of the WVOGPA. "By imposing the openness requirement on governing bodies who 'deliberate toward a decision on a matter,' the Legislature clearly intended to apply to those assemblies where discussions leading up to a decision take place." *McComas*, 197 W. Va. at 195, 475 S.E.2d at 287.

Accordingly, I must agree with the Gazette that, as applied by the circuit court and the majority, the scope of the commercial competition exception was and is impermissibly and unjustifiably expanded in scope and is overly broad. That said, even with this overly expansive reading and definition of the commercial competition exception, it is still difficult to understand how discussion of most of the topics at issue in this case could qualify as commercial competition. Significantly, we really do not know how most of the topics at issue allegedly qualify as "commercial competition."[13] The Board never explained how each topic of discussion qualifies, leaving it to the circuit

---

[13] Although colleges and universities undoubtedly compete with each other, not all of that competition can be classified as commercial in nature without expanding the exception to the point where nothing will be left of the general rule requiring public disclosure.

court and this Court to speculate, apparently hoping that the courts will defer to them as a governing body and conclude that it has met its factual and evidentiary burden to establish the applicability of the commercial competition exception to the topics discussed at the five closed, executive sessions between June 19, 2020, and September 18, 2020.

Those topics and issues include: (1) the University's response to the COVID-19 pandemic, (2) a social justice petition filed by members of the University community to increase inclusion and diversity efforts following the death of George Floyd, and (3) the University budgets for 2020 and 2021, all of which were considered and ruled upon in the circuit court's February 27, 2023, order. In its April 28, 2023, order, the circuit court considered and ruled upon topics and issues involving (4) expectations and outlook concerning the then upcoming football season, (5) the business college, (6) emergency pay policy, (7) tuition and fees, and (8) the status of certain capital projects.[14] Certainly, some of these topics and issues may be exempt from disclosure and open meetings requirements due to one or more of the other exceptions to the WVOGPA, such as those involving deliberative process, internal memoranda, confidential government documents, or attorney-client privilege. Discussions concerning specific potential or contemplated real estate transactions, prospective contracts, potential research and specific economic development projects may qualify for the commercial competition

---

[14] Not including the Title IX issue which was found to be subject to attorney-client privilege without any argument that it involved commercial competition.

exception. Nevertheless, at issue here is whether the Board met its evidentiary burden to exempt each, all, or any of these topics and issues from open meeting disclosure and public access under the "commercial competition" exception.

As indicated, it is the burden of the Board to establish that the commercial competition exception applies to each of these topics in order to justify exempting them from the WVOGPA. To do so, it must establish that the topic implicates and fits within the scope of the commercial competition exception. It must explain how it fits and produce sufficient evidence to establish that so-called premature disclosure of certain information concerning the topic "might" logically result in some adverse effect on the financial or other interest of the State. While proof that such disclosure would in fact cause adverse effect is not required, there must be evidence sufficient to establish that logically it might cause harm.

I simply do not believe that the Board adequately identified and explained in the various affidavits submitted to the circuit court how the specific decision, transaction, or action at issue are similar in nature to the three examples preceding the general phrase at issue, or how each topic is capable of completion and finalization, or how disclosure of each of the topics would or could logically result in harm or adverse effect on the University. It is also important to note that in a given case, part of the discussion of a particular topic may fit under the commercial competition exception, or

28

under one of the other enumerated exceptions, but the balance of the issue should be severed and considered and discussed openly pursuant to the WVOGPA. It does not appear that any effort was made by the Board, the circuit court, or the majority, to apply the severability principle to the analysis in order to limit the extent and scope of the veil of subject secrecy.

A review of the affidavits demonstrates that, for the most part, they simply include conclusory and summary statements and raise broad, general concerns without any specific detail or explanation beyond the allegation that certain information might cause a potential student to choose to attend another university or that a rival university might somehow take advantage of the situation if the information were public. In other instances, the affidavits merely indicate generally that the topics involve so-called "commercially sensitive information" without explaining or defining what that means. In fact, many of the affidavits seem to equate financially related topics and so-called commercially sensitive issues to commercial competition. These terms are not contained in the exception and are not synonymous with commercial competition. Just because something involves financial issues, like a budget review, or something the Board might consider "commercially sensitive" does not mean it fits within the commercial competition exception. Without getting into the specifics of each affidavit, these deficiencies are present in the December 9, 2021, affidavit of James Robert Alsop and his Expert Witness Disclosure; the December 7, 2021, affidavit of James Moeser; the

December 8, 2021, affidavit of Thomas V. Flaherty; and the December 6, 2021, affidavit of Nathan Dickmeyer and his Expert Witness Disclosure. Many of the affidavits also include arguments such as what other Universities do and what they claim are "best practices," but such evidence and opinions are irrelevant to the question of the scope and applicability of the commercial competition exception under West Virginia law.

The only affidavit that even comes close to providing any specifics and even makes a passing attempt to explain the potential for an adverse effect is the March 1, 2022, affidavit of James Robert Alsop. Mr. Alsop indicates that premature disclosure of whether the University will proceed with certain athletic events in light of the COVID-19 pandemic might adversely affect media contracts, stadium vendor contracts, ticket sales, and athlete retention. But he fails to explain how this constitutes commercial competition or what potential effect it might have on "existing" rather than prospective contracts. Again, the Board appears to argue that, given the University's general competition with every other university or college in the world for students and faculty, any information that might affect a student's attendance decision satisfies the commercial competition exception. This is not a reasonable standard for application of the commercial competition exception and it is inconsistent with the direction of the Supreme Court of Appeals to accord an expansive reading of the WVOGPA's provisions. It frustrates the legislative intent and undermines and negates the fundamental and far-

reaching goals and purpose of the WVOGPA. *See McComas*, 197 W. Va. at 197, 475 S.E.2d at 289.

Finally, the majority tries to make much of the fact the Gazette conducted only limited discovery in the case and produced virtually no evidence to counter the affidavits presented by the Board. This argument misses the point. As the majority acknowledges, the burden of proof to establish applicability of the exception starts and forever remains with the Board, the party asserting the exception. The fact that the Gazette may have only conducted limited discovery and produced limited evidence for the court to consider is irrelevant. Moreover, it is inconsistent with the majority's own, correct statement as to the party with the burden. Simply stated, the evaluation of the evidence does not require or involve a comparison or weighing of evidence produced by the opposing parties. The only issue is whether the party with the burden of proof has met its burden. I do not believe that the Board met its burden of proof.

For these aforementioned reasons, I respectfully concur, in part, and dissent, in part, in the majority's opinion.